Hanoch TEL–OREN, in his capacity as father, on behalf of the deceased, Imry Tel-Oren, et al., Appellants,

v.

LIBYAN ARAB REPUBLIC, et al.

Hanoch TEL–OREN, et al., Appellants,

v.

LIBYAN ARAB REPUBLIC, et al.

Nos. 81–1870, 81–1871.

United States Court of Appeals, District of Columbia Circuit.

Argued March 24, 1982.

Decided Feb. 3, 1984.

Michael S. Marcus, Arlington, Va., with whom Oren R. Lewis, Jr., and Richard H. Jones, Arlington, Va., were on brief, for appellants.

Karla J. Letsche, Washington, D.C., for appellee, National Association of Arab Americans. Cherif Sedky and Lawrence Coe Lanpher, Washington, D.C., were on brief, for appellee, National Association of Arab Americans.

Michael Kennedy, New York City, was on brief, for appellee, Palestine Information Office.

---

**18.** See Fed.R.App.P. 40(a).

**19.** See 28 U.S.C. § 2112(a) (1976).

**20.** See text *supra* at note 15.

**21.** See 16 U.S.C. § 825*l*(b) (1982).

Michael E. Tigar, Washington, D.C., entered an appearance for appellee, Palestine Congress of North America.

Before EDWARDS and BORK, Circuit Judges, and ROBB, Senior Circuit Judge.

Concurring opinions filed by Circuit Judge HARRY T. EDWARDS, Circuit Judge BORK, and Senior Circuit Judge ROBB.

PER CURIAM:

Plaintiffs in this action, mostly Israeli citizens, are survivors and representatives of persons murdered in an armed attack on a civilian bus in Israel in March 1978. They filed suit for compensatory and punitive damages in the District Court, naming as defendants the Libyan Arab Republic, the Palestine Liberation Organization, the Palestine Information Office, the National Association of Arab Americans, and the Palestine Congress of North America.[1]

In their complaint, plaintiffs alleged that defendants were responsible for multiple tortious acts in violation of the law of nations, treaties of the United States, and criminal laws of the United States, as well as the common law. Jurisdiction was claimed under four separate statutes: 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1350 (providing jurisdiction over actions by an alien alleging a tort committed in violation of the law of nations or a treaty of the United States); and the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611. For purposes of our jurisdictional analysis, we assume plaintiffs' allegations to be true.

The District Court dismissed the action both for lack of subject matter jurisdiction and as barred by the applicable statute of limitations. *Hanoch Tel-Oren v. Libyan Arab Republic,* 517 F.Supp. 542 (D.D.C.

1981). Plaintiffs appeal the District Court's rulings on two of their claimed jurisdictional bases, 28 U.S.C. §§ 1331, 1350, and on the statute of limitations issue.

We affirm the dismissal of this action. Set out below are separate concurring statements of Judge Edwards, Judge Bork, and Senior Judge Robb, indicating different reasons for affirming the result reached by the District Court.

HARRY T. EDWARDS, Circuit Judge, concurring:

This case deals with an area of the law that cries out for clarification by the Supreme Court. We confront at every turn broad and novel questions about the definition and application of the "law of nations." As is obvious from the laborious efforts of opinion writing, the questions posed defy easy answers.

At issue in this case is an 'aged but little-noticed provision of the First Judiciary Act of 1789, which gives federal courts jurisdiction over a minute class of cases implicating the law of nations. Thus, it is not startling that the central controversy of this action has now produced divided opinions between and within the circuits. The opinions of Judge Bork and Judge Robb are fundamentally at odds with the decision of the Second Circuit in *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), which, to my mind, is more faithful to the pertinent statutory language and to existing precedent. Although I cannot concur in the opinions of my colleagues, I do agree with them that the decision of the District Court should be affirmed. I write separately to underscore the rationale for my decision; I do this because, as will be apparent, there are sharp differences of viewpoint among the judges who have grappled with these cases over the meaning and application of 28 U.S.C. § 1350 (1976).[1]

---

1. Plaintiffs do not pursue their claim against the Palestine Congress of North America on appeal.

1. That I confine my remarks to issues directly related to the construction of § 1350 should in no respect be read as an endorsement of other

aspects of my colleagues' opinions. Indeed, I disagree with much of the peripheral discussion they contain.

My analysis also is limited to the allegations against the Palestine Liberation Organization. I agree with the District Court that the com-

## I. BACKGROUND

On March 11, 1978, thirteen heavily armed members of the Palestine Liberation Organization (hereinafter "the PLO") turned a day trip into a nightmare for 121 civilian men, women and children. The PLO terrorists landed by boat in Israel and set out on a barbaric rampage along the main highway between Haifa and Tel Aviv. They seized a civilian bus, a taxi, a passing car, and later a second civilian bus. They took the passengers hostage. They tortured them, shot them, wounded them and murdered them. Before the Israeli police could stop the massacre, 22 adults and 12 children were killed, and 73 adults and 14 children were seriously wounded. Most of the victims were Israeli citizens; a few were American and Dutch citizens. They turned to our courts for legal redress and brought this action for damages asserting jurisdiction under 28 U.S.C. §§ 1331 and 1350 (1976). The District Court dismissed the action for lack of subject matter jurisdiction. The critical issue on appeal is whether plaintiffs alleged sufficient facts to meet the jurisdictional elements of those sections.

## II. THE FILARTIGA DECISION

My inquiry into the sufficiency of plaintiffs' allegations is guided by the Second Circuit's decision in *Filartiga*. For reasons set out below, I adhere to the legal principles established in *Filartiga* but find that factual distinctions preclude reliance on that case to find subject matter jurisdiction in the matter now before us. Specifically, I do not believe the law of nations imposes the same responsibility or liability on non-state actors, such as the PLO, as it does on states and persons acting under color of state law. Absent direction from the Supreme Court on the proper scope of the obscure section 1350, I am therefore not prepared to extend *Filartiga*'s construction of section 1350 to encompass this case.

The pertinent allegations in *Filartiga* are as follows. Dr. Joel Filartiga, a Paraguayan known to oppose the Paraguayan Stroessner regime, and his daughter, Dolly, alleged that, in 1976, the defendant Pena-Irala, a Paraguayan police official, had kidnapped and tortured to death Dr. Filartiga's 17-year-old son, Joelito. They claimed he was killed in retaliation for his father's political activities. On the day of the murder, Dolly Filartiga was taken to Pena's home and confronted with her brother's body, which bore marks of severe torture. Thereafter, Filartiga commenced a murder action against Pena in a Paraguayan court. The action was still pending at the time of the Second Circuit opinion.

Pena entered the United States in 1978 on a visitor's visa and remained beyond the term of the visa, living in Brooklyn, New York. Dolly Filartiga, living in Washington, D.C., learned of his presence and notified the Immigration and Naturalization Service. She also filed a civil complaint against him, alleging that he had wrongfully caused her brother's death by torture and seeking compensatory and punitive damages of ten million dollars. Jurisdiction was claimed under the general federal question provision, 28 U.S.C. § 1331 (1976), and under the Alien Tort Statute, 28 U.S.C. § 1350 (1976). The District Court dismissed the complaint on jurisdictional grounds. In so doing, the trial court relied on prior cases in which the Second Circuit had defined the "law of nations" to encompass only relationships between states, or an individual and a foreign state, and not a state's treatment of its own citizens. *E.g., Dreyfus v. von Finck,* 534 F.2d 24, 30–31 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975). It concluded that a Paraguayan plaintiff's suit against a Paraguayan defendant did not implicate the law of nations and, therefore,

---

plainants' allegations against the Palestine Information Office and the National Association of Arab Americans are too insubstantial to satisfy the § 1350 requirement that a violation of the law of nations be stated. *Hanoch Tel-Oren v. Libyan Arab Republic,* 517 F.Supp. 542,

549 (D.D.C.1981). Jurisdiction over Libya is barred by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611 (1976), which preserves immunity for tort claims unless injury or death occurs in the United States. 28 U.S.C. §§ 1604, 1605(a)(5) (1976).

did not fit within the jurisdictional limits of section 1350. The Second Circuit reversed the district court and remanded for further proceedings.

Section 1350 provides that a district court shall have original jurisdiction over civil actions "*by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.*" In the absence of an allegation of a treaty violation, the critical issue in *Filartiga* was whether torture constitutes a violation of the law of nations. In determining that it does, Judge Kaufman reviewed the accepted sources of international law—the usage of nations, judicial opinions and the works of jurists—and concluded that *official torture* of both aliens and citizens is prohibited by the law of nations. 630 F.2d at 884. That section 1350 was enacted in the Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77, when world perceptions both of the role of international law and its substantive provisions differed considerably from perceptions of today, did not preclude this result. Judge Kaufman took guidance from *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (holding that the traditional prohibition against seizure of an enemy's coastal fishing vessels had ripened from a standard of comity into a settled rule of international law), and observed that "courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." 630 F.2d at 881.

The opinion thus established several propositions. First, the "law of nations" is not stagnant and should be construed as it exists today among the nations of the world. *Id.* Second, one source of that law is the customs and usages of civilized nations, as articulated by jurists and commentators. *Id.* at 884. Third, international law today places limits on a state's power to torture persons held in custody, and confers "fundamental rights upon all people" to be free from torture. *Id.* at 885. Fourth, section 1350 opens the federal courts for adjudication of the rights already recognized by international law. *Id.* at 887.

Because I am substantially in accord with these four propositions, and Judge Bork and Judge Robb apparently are not, I am unable to join in their opinions.

## III. SECTION 1350 AS THE SOURCE OF THE "RIGHT TO SUE"

First, and most fundamentally, I diverge from the views of my colleague Judge Bork regarding the necessary elements of this court's jurisdiction. The Second Circuit did not require plaintiffs to point to a specific right to sue under the law of nations in order to establish jurisdiction under section 1350; rather, the Second Circuit required only a showing that the defendant's actions violated the substantive law of nations. In contrast, Judge Bork would deny jurisdiction to any plaintiff—presumably including those in *Filartiga*—who could not allege a specific right to sue apart from the language of section 1350 itself. In Part A, below, I outline the Second Circuit's formulation of section 1350 and summarize my reasons for endorsing it. In Part B, I offer an alternative formulation of section 1350 under which domestic tort law, not the law of nations, provides plaintiffs with the substantive right needed to trigger application of section 1350. I am less comfortable with the alternative formulation; however, in the face of the obscure history of section 1350, I would be remiss were I to ignore a tenable construction of this difficult statutory provision.

### A. *Section 1350 Provides a Right of Action and a Forum: The* Filartiga *Formulation*

Judge Bork's suggestion that section 1350 requires plaintiffs to allege a right to sue granted by the law of nations is seriously flawed. Initially, it assumes that the "law of nations" could provide a specific, articulated right to sue in a form other than a treaty or executive agreement. Yet no evidence is offered to indicate that jurists or commentators have ever looked to the law of nations to determine when a wrongful deed is *actionable.* This absence of evidence is not surprising, because it is clear that "[i]nternational law itself, finally, does

not require any particular reaction to violations of law.... Whether and how the United States wished to react to such violations are domestic questions...." L. HENKIN, FOREIGN AFFAIRS AND THE CONSTITUTION 224 (1972) (footnote omitted).

The law of nations thus permits countries to meet their international duties as they will, *see* L. HENKIN, R. PUGH, O. SCHACHTER & H. SMIT, INTERNATIONAL LAW 116 (1980); *cf.* 1 C. HYDE, INTERNATIONAL LAW 729 n. 5 (2d rev. ed. 1945). In some cases, states have undertaken to carry out their obligations in agreed-upon ways, as in a United Nations Genocide Convention, which commits states to make genocide a crime, L. HENKIN, R. PUGH, O. SCHACHTER & H. SMIT, *supra,* or in bilateral or multilateral treaties. Otherwise, states may make available their municipal laws in the manner they consider appropriate. *See* RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 3 comment h & illustration 5 (1965) (domestic law of a state may provide a remedy to a person injured by a violation of a rule of international law). As a result, the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations; by consensus, the states leave that determination to their respective municipal laws. Indeed, given the existing array of legal systems within the world, a consensus would be virtually impossible to reach—particularly on the technical accoutrements to an action—and it is hard even to imagine that harmony ever would characterize this issue.

In consequence, to require international accord on a right to sue, when in fact the law of nations relegates decisions on such questions to the states themselves, would be to effectively nullify the "law of nations" portion of section 1350. There is a fundamental principle of statutory construction that a statute should not be construed so as to render any part of it "inoperative or superfluous, void or insignificant," 2A C. SANDS, STATUTES AND STATUTORY CONSTRUCTION § 46.06 (4th ed. 1973), and there exists a presumption against a construction yielding that result. *See Federal Trade Commission v. Manager, Retail Credit Co., Miami Branch Office,* 515 F.2d 988, 994 (D.C. Cir.1975). Yet, the construction offered by Judge Bork would have the effect of voiding a significant segment of section 1350.[2]

Judge Bork argues that the statute retains meaning under his interpretation because he recognizes that the drafters of section 1350 perceived of certain offenses against the law of nations. He enumerates three offenses recognized by Blackstone—violation of safe-conducts, infringement of the rights of ambassadors, and piracy—and insists that these were the offenses that the drafters of section 1350 had in mind. This

---

**2.** In obvious contrast is a treaty, which may create judicially enforceable obligations when that is the will of the parties to it. *See People of Saipan v. Department of Interior,* 502 F.2d 90, 97 (9th Cir.1974) (elaborating criteria to be used to determine whether international agreement establishes affirmative and judicially enforceable obligations without implementing legislation), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). Unlike the law of nations, which enables each state to make an independent judgment as to the extent and method of enforcing internationally recognized norms, treaties establish both obligations and the extent to which they shall be enforceable. We therefore must interpret section 1350 in keeping with the fact, well-known to the framers of section 1350, that a treaty and the law of nations are entirely different animals. As Judge Bork states, for two hundred years it has been established that treaties by their terms and context may create enforceable obligations. Similarly, for two hundred years, it has been established that the law of nations leaves up to municipal law whether to provide a right of action to enforce obligations created by the law of nations. Section 1350 opened federal courts to aliens to challenge violations of treaties insofar as treaty terms expressly or impliedly established affirmative and judicially enforceable obligations. Congress also opened courts to aliens to challenge violations of the law of nations, to the extent that the law of nations established a binding obligation. Section 1350 thus provides a forum for actions brought to enforce obligations binding on parties, whether as a result of treaties or the law of nations. To argue that § 1350, under any formulation, could create a right to sue or somehow make all treaties self-executing, when parties to the treaties intend otherwise, is to throughly misconstrue the nature of treaty law.

explanation is specious, not responsive. Judge Bork does nothing more than concede that, in 1789, the law of nations clause covered three substantive offenses. However, under his construction of section 1350, this concession is meaningless unless it is also shown that the law of nations created a private right of action to avenge the three law of nations violations to which Blackstone averted—a showing that would require considerable skill since the law of nations simply does not create rights to sue. Indeed, in the very passage quoted by Judge Bork, Blackstone makes clear that it was the municipal laws of England, not the law of nations, that made the cited crimes offenses: "The principal offenses against the law of nations, *animadverted on as such by the municipal laws of England,* are of three kinds: 1. Violation of safeconducts; 2. Infringement of the rights of embassadors; and, 3. Piracy." 4 BLACKSTONE'S COMMENTARIES 67 (Welsby ed. 1854) (emphasis added). In short, under Judge Bork's construction of the statute, section 1350 would lose virtually all meaning.

Equally basic, to require an express right to sue is directly at odds with the language of the statute, which grants jurisdiction over civil actions for a tort "committed in violation of the law of nations." Unlike section 1331, which requires that an action "arise under" the laws of the United States, section 1350 does not require that the action "arise under" the law of nations, but only mandates a "violation of the law of nations" in order to create a cause of action. The language of the statute is explicit on this issue: by its express terms, nothing more than a *violation* of the law of nations is required to invoke section 1350. Judge Bork nevertheless would propose to write into section 1350 an additional restriction that is not even suggested by the statutory language. Congress, of course, knew full well that it could draft section 1350 with "arising under" language, or the equivalent, to require a "cause of action" or "right to sue," but it chose not to do so.[3] There simply is no basis in the language of the statute, its legislative history or relevant precedent to read section 1350 as though Congress had required that a right to sue must be found in the law of nations.[4]

**3.** It might be argued that in 1789 Congress had not enacted general federal question jurisdiction, with its "arising under" provision, and could not have used that phraseology as a reference point. Not until 1875 did Congress give federal courts general original jurisdiction over federal question cases. Act of Mar. 3, 1875, ch. 137, § 1, 18 Stat. 470. However, in its original form, the predecessor to § 1350 did not contain the word "committed." The pertinent part of the clause granted jurisdiction "where an alien sues for a tort only in violation of the law of nations." The word "committed" appears in a 1948 recodification of the Judicial Code, Act of June 25, 1948, ch. 646, § 1350, 62 Stat. 869, 934, but was absent in earlier recodifications. *See, e.g.,* Act of Mar. 3, 1911, ch. 231, § 24, par. 17, 36 Stat. 1087, 1093. By 1948 the term "arising under" was a well-established element of federal question jurisdiction, *see American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916) (a suit "arises under" the law that creates the action), and would have been the obvious choice of wording had Congress wished to make explicit that, in order to invoke § 1350, a right to sue must be found in the law of nations.

**4.** I disagree both with Judge Bork and with plaintiffs in this action that for purposes of the

issues raised in this case, the jurisdictional requirements of § 1331 and § 1350 are the same.

However, for several reasons I believe plaintiffs' claim under § 1331 fails as well. My analysis on that issue proceeds on two paths, depending on whether the plaintiff is a citizen or an alien.

As to aliens, most of the plaintiffs here, jurisdiction under § 1331 is available at least to the extent that § 1350 applies. If it does, their action "arises under" § 1350 and, therefore, under a law of the United States, as required by § 1331.

Citizens of the United States, in this action the Tel-Oren plaintiffs, do not meet the alienage requirement of § 1350 and must seek other law under which their action might arise. The only plausible candidate is the law of nations itself.

Assuming, without deciding, that the law of nations constitutes a law of the United States for § 1331 jurisdictional purposes, *see* Moore, *Federalism and Foreign Relations,* 1965 DUKE L.J. 248, 291–97 (arguing that § 1331 includes cases arising under a federal decisional law of foreign relations); *cf.* L. HENKIN, FOREIGN AFFAIRS AND THE CONSTITUTION 222–23 (1972) (federal courts determine international law and apply it as though it were federal law), the language of § 1331, unlike § 1350, suggests that plaintiffs must identify a remedy granted by the law of

Indeed, a 1907 opinion of the United States Attorney General suggests just the opposite. It asserts that section 1350 provides both a right to sue and a forum. Responding to an inquiry about the remedies available to Mexican citizens harmed by the actions of an American irrigation company along the Rio Grande River, the Attorney General wrote,

As to indemnity for injuries which may. have been caused to citizens of Mexico, I am of opinion that existing statutes *provide a right of action and a forum.* Section 563, Revised Statutes, clause 16, gives to district courts of the United States jurisdiction "of all suits brought by any alien for a tort only in violation of the law of nations or of a treaty of the United States." ... *I repeat that the statutes thus provide a forum and a right of action.* I can not, of course, undertake to say whether or not a suit under either of the foregoing statutes would be successful. That would depend upon whether the diversion of the water was an injury to substantial rights of citizens of Mexico under the principles of interna-

tional law or by treaty, and could only be determined by judicial decision.

26 Op. Att'y Gen. 250, 252–53 (1907) (emphasis added). The opinion bolsters the view of the Second Circuit,[5] which I endorse, that section 1350 itself provides a right to sue for alleged violations of the law of nations.[6]

Judge Bork, in his rejection of *Filartiga,* reasons as follows: (a) international law grants plaintiffs no express right to sue in a municipal court; (b) for numerous reasons, primarily related to separation of powers, it would be inappropriate to imply one; (c) since section 1350 requires that international law give plaintiffs a cause of action, and it does not, we cannot find jurisdiction. In my view, the first two steps in the analysis are irrelevant and the third step is erroneous. The decision in *Filartiga* did not hold that, under section 1350, the law of nations must provide a cause of action—that is, a right to sue—in order to find jurisdiction. The existence of an express or implied cause of action was immaterial to the jurisdictional analysis of the Second Circuit. By

nations or argue successfully. for one to be implied. Plaintiffs here are not able to point to a right to sue in international law and I decline to imply one, given my belief, set out *supra,* that the law of nations consciously leaves the provision of rights of action up to the states.

As an alternative basis for declining § 1331 jurisdiction, I note that the law of nations quite tenably does not provide these plaintiffs with any substantive right that has been violated. As I discuss at length in Section VI of this opinion, I do not believe that the law of nations, as currently developed and construed, holds individuals responsible for most private acts; it follows logically that the law of nations provides no substantive right to be free from the private acts of individuals, and persons harmed by such acts have no right, under the law of nations, to assert in federal court. Thus, even if the law of nations constitutes a law of the United States, and even if § 1331 did not require that a right to sue be granted by the relevant law of the United States, plaintiffs still would have no § 1331 jurisdiction because no legal right has been violated.

5. The Second Circuit read § 1350 "not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law." *Filartiga,* 630 F.2d at 887. I construe

this phrase to mean that aliens granted substantive rights under international law may assert them under § 1350. This conclusion as to the meaning of this crucial yet obscure phrase results in part from the noticeable absence of any discussion in *Filartiga* on the question whether international law granted a right of action.

6. While opinions of the Attorney General of course are not binding, they .are entitled to some deference, especially where judicial decisions construing a statute are lacking. *See, e.g., Oloteo v. INS,* 643 F.2d 679, 683 (9th Cir.1981) (opinion deserves some deference); *Montana Wilderness Ass'n v. United States Forest Serv.,* 496 F.Supp. 880, 884 (D.Mont. 1980) (opinions are given great weight although not binding), *aff'd, in part,* 655 F.2d 951 (9th Cir.1981), *cert. denied,* 455 U.S. 989 (1982); *Pueblo of Taos v. Andrus,* 475 F.Supp. 359, 365 n. 4 (D.D.C.1979); *cf. Blake v. Kline,* 612 F.2d 718, 724 n. 13 (3d Cir.1979) (state attorney general opinions are entitled to great respect and should be followed where judicial decisions construing statute are lacking) (citing *In re Jackson,* 268 F.Supp. 434, 443 (E.D.Mo.), *aff'd, Zuke v. Mercantile Trust Co.,* 385 F.2d 775 (8th Cir.1967)) *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980).

focusing on this issue, Judge Bork has skirted the threshold question whether the statute even requires that the law of nations grant a cause of action. I do not believe that the statute requires such a finding, or that the decision in *Filartiga* may be lightly ignored.

At this point, it is appropriate to pause to emphasize the extremely narrow scope of section 1350 jurisdiction under the *Filartiga* formulation. Judge Kaufman characterized the torturer in *Filartiga* as follows: "Indeed, for purposes of civil liability, the torturer has become—like the pirate and slave trader before him—*hostis humani generis,* an enemy of all mankind." *Filartiga,* 630 F.2d at 890. The reference to piracy and slave-trading is not fortuitous. Historically these offenses held a special place in the law of nations: their perpetrators, dubbed enemies of all mankind, were susceptible to prosecution by any nation capturing them. As one writer has explained,

> Before International Law in the modern sense of the term was in existence, a pirate was already considered an outlaw, a '*hostis humani generis.*' According to the Law of Nations the act of piracy makes the pirate lose the protection of his home State, and thereby his national character. . . . Piracy is a so-called 'international crime'; the pirate is considered the enemy of every State, and can be brought to justice anywhere.

1 L. OPPENHEIM, INTERNATIONAL LAW § 272, at 609 (H. Lauterpacht 8th ed. 1955) (footnote omitted); *see also id.* § 151, at 339 (every state can punish crimes like piracy or slave trade on capture of the criminal, whatever his nationality); Dickinson, *Is the Crime of Piracy Obsolete?,* 38 HARV.L.REV. 334, 335 (1925). Judge Kaufman did not argue that the torturer is like a pirate for criminal prosecution purposes, but only for civil actions. The inference is that persons may be susceptible to civil liability if they commit *either* a crime traditionally warranting universal jurisdiction *or* an offense that comparably violates current norms of international law. To identify such crimes, I look for guidance to the RESTATEMENT OF THE LAW OF FOREIGN RELATIONS (REVISED) § 702 (Tent.Draft No. 3, 1982), which enumerates as violations of international law state-practiced, -encouraged or -condoned (a) genocide; (b) slavery or slave trade; (c) the murder or causing the disappearance of individuals; (d) torture or other cruel, inhuman or degrading treatment or punishment; (e) prolonged arbitrary detention; (f) systematic racial discrimination; (g) consistent patterns of gross violations of internationally recognized human rights. *See also* Blum & Steinhardt, *Federal Jurisdiction over International Human Rights Claims: The Alien Tort Claims Act after Filartiga v. Pena-Irala,* 22 HARV.INT'L L.J. 53, 90 (1981) (focusing on genocide, summary execution, torture and slavery as core human rights violations). I, of course, need not determine whether each of these offenses in fact amounts to a law of nations violation for section 1350 purposes. The point is simply that commentators have begun to identify a handful of heinous actions—each of which violates definable, universal and obligatory norms, *see* Blum & Steinhardt, *supra,* at 87–90—and in the process are defining the limits of section 1350's reach.[7]

The *Filartiga* formulation is not flawless, however. While its approach is consistent with the language of section 1350, it places an awesome duty on federal district courts to derive from an amorphous entity—*i.e.,* the "law of nations"—standards of liability applicable in concrete situations. The difficult law of nations questions animating this particular case suggest the burden that

7. Indeed, international law itself imposes limits on the extraterritorial jurisdiction that a domestic court may exercise. It generally recognizes five theories of jurisdiction, the objective territorial, national, passive, protective and universal. *See* RESTATEMENT OF THE LAW OF FOREIGN RELATIONS (REVISED) § 402 (Tent.Draft No. 2, 1981); *see also United States v. James-Robin-son,* 515 F.Supp. 1340, 1344 n. 6 (S.D.Fla.1981). The premise of universal jurisdiction is that a state "may exercise jurisdiction to define and punish certain offenses recognized by the community of nations as of universal concern," RESTATEMENT OF THE LAW OF FOREIGN RELATIONS (REVISED), *supra,* § 404, even where no other recognized basis of jurisdiction is present.

would attach to each case of this kind. In the 18th century this pursuit was no doubt facilitated both by a more clearly defined and limited body of "international crimes" than exists today, and by the working familiarity of jurists with that body of law. Although I am convinced that it is possible to discover governing standards of liability, the formidable research task involved gives pause, and suggests consideration of a quite plausible alternative construction of section 1350.

## B. *An Alternative Approach: Municipal Law as the Standard of Liability*

Under an alternative formulation, section 1350 may be read to enable an alien to bring a common law tort action in federal court without worrying about jurisdictional amount or diversity, as long as a violation of international law is also alleged. Unlike the first approach, set out above, the substantive right on which this action is based must be found in the domestic tort law of the United States. The text of the 1789 Judiciary Act, coupled with the concerns of 18th century legal scholars for a single judicial voice on foreign affairs, as expressed in the Federalist Papers and elsewhere, provide some support for this interpretation of the statute.[8] However, the formulation also raises a host of complex problems of its own.

### 1. *Historical Underpinnings*

I begin by tracing the historical setting in which the original section 1350 was drafted. The First Judiciary Act granted to circuit courts

**8.** One § 1350 case, discussed at length, *infra*, has adopted this framework, *see Adra v. Clift*, 195 F.Supp. 857 (D.Md.1961), and one law review note has endorsed the approach. *See* Note, *A Legal Lohengrin: Federal Jurisdiction Under the Alien Tort Claims Act of 1789*, 14 U.S.F.L.Rev. 105, 123 (1979).

**9.** Despite confusion in an early case, *Mason v. The Ship Blaireau*, 6 U.S. (2 Cranch) 240, 264, 2 L.Ed. 266 (1804), by 1809 it was clear that the Constitution bars extending diversity jurisdiction to suits between aliens. *See Hodgson & Thompson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809).

original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs, or petitioners; or an alien is a party, or the suit is between a citizen of the State where the suit is brought, and a citizen of another State.

Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 78. This early grant of diversity jurisdiction opened federal courts to civil suits by aliens, provided they were able to meet the requisite jurisdictional amount.[9] Not content to treat aliens like citizens of a non-forum state, the drafters also gave district courts concurrent original jurisdiction with both state courts and circuit courts, "as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77. There is evidence, set out *infra,* that the intent of this section was to assure aliens access to federal courts to vindicate any incident which, if mishandled by a state court, might blossom into an international crisis. If left with diversity jurisdiction alone, aliens would have to turn to state courts to bring actions below the jurisdictional amount. Concern that state courts might deny justice to aliens, thereby evoking a belligerent response from the alien's country of origin, might have led the drafters to conclude that aliens should have the option of bringing suit in federal court, whatever the amount in controversy.[10]

**10.** It might also be argued that § 1350 addressed actions for tortious violations only of the law of nations, not domestic law, and that the 1789 Act's grant of diversity jurisdiction covered domestic torts only. However, when the 1789 Judiciary Act was drafted, lawyers had no doubt that the law of nations was a part of the common law encompassed by the diversity jurisdiction statute. *See* Dickinson, *The Law of Nations as Part of the National Law of the United States (pt. 1),* 101 U.Pa.L.Rev. 26, 27 (1952); 4 Blackstone's Commentaries 66–67 (Welsby ed. 1854); *see also Respublica v. De Longchamps*, 1 U.S. (1 Dall.) 111, 116–17, 1 L.Ed. 59 (1784) (common law criminal prosecu-

The Federalist Papers demonstrate unequivocally the "importance of national power in all matters relating to foreign affairs and the inherent danger of state action in this field...." *Hines v. Davidowitz,* 312 U.S. 52, 62 n. 9, 61 S.Ct. 399, 401 n. 9, 85 L.Ed. 581 (1941) (citing THE FEDERALIST Nos. 3, 4, 5, 42 & 80). The Constitution reflects this concern with an array of techniques for centralizing foreign relations, including Article III, § 2, which extends judicial power, *inter alia,* to controversies between a state or its citizens and foreign states, citizens or subjects.

This interest in the rights of aliens is hardly surprising when considered in the context of early American history and traditional precepts of the law of nations. Under the law of nations, states are obliged to make civil courts of justice accessible for claims of foreign subjects against individuals within the state's territory. 1 L. OPPENHEIM, INTERNATIONAL LAW § 165a, at 366 (H. Lauterpacht 8th ed. 1955). If the court's decision constitutes a denial of justice,[11] or if it appears to condone the original wrongful act, under the law of nations the United States would become responsible for the failure of its courts and be answerable not to the injured alien but to his home state. A private act, committed by an individual against an individual, might thereby escalate into an international confrontation. *See* J. BRIERLY, THE LAW OF NATIONS 284–91 (6th ed. 1963). The focus of attention, then,

was on actions occurring within the territory of the United States, or perpetrated by a U.S. citizen, against an alien. For these acts, the United States was responsible.

Alexander Hamilton outlined precisely this fear as justification for the Constitution's grant of federal jurisdiction for all cases involving aliens:

> The union will undoubtedly be answerable to foreign powers for the conduct of its members. And the responsibility for an injury ought ever to be accompanied with the faculty of preventing it. As the denial or perversion of justice by the sentences of courts, as well as in any other manner, is with reason classed among the just causes of war, it will follow that the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned. This is not less essential to the preservation of the public faith, than to the security of the public tranquility.

THE FEDERALIST No. 80, at 536 (A. Hamilton) (J. Cooke ed. 1961).[12] Having raised the specter of war to convince his readers that "the peace of the *whole* ought not to be left at the disposal of a *part,*" *id.* at 535 (emphasis in original), Hamilton considered whether he should distinguish between "cases arising upon treaties and the laws of nations, and those which may stand merely on the footing of the municipal law." *Id.* at 536. He wrote,

---

tion for violation of law of nations); *cf.* Warren, *New Light on the History of the Federal Judiciary Act of 1789,* 37 HARV.L.REV. 49, 73 (1923) (arguing that federal courts were intended to assert both statutory and common law criminal jurisdiction, including over law of nations offenses). Section 1350 therefore offered to aliens who could meet the diversity jurisdiction criteria, and therefore bring an action in the circuit court, an alternative forum, under some circumstances. For aliens unable to meet those criteria, § 1350 opened the district courts for assertion of their claims.

11. Brierly enumerates "corruption, threats, unwarrantable delay, flagrant abuse of judicial procedure, a judgment dictated by the executive, or so manifestly unjust that no court which was both competent and honest could have given it" as instances of a denial of jus-

tice. J. BRIERLY, THE LAW OF NATIONS 287 (6th ed. 1963).

12. Similarly, at the Virginia Convention James Madison said, "We well know, sir, that foreigners cannot get justice done them in these courts, and this has prevented many wealthy gentlemen from trading or residing among us." 3 ELLIOT'S DEBATES 583 (1888). *See also* P. BATOR, P. MISHKIN, D. SHAPIRO & M. WECHSLER, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 17 (2d ed. 1973) (concluding that "the need for a grant [of federal judicial power] going beyond cases involving treaties and foreign representatives seems to have been undisputed"). *But see* Warren, *supra* note 10, at 56 & n. 19 (1923) (among the proposed amendments to the Constitution was "the elimination of all jurisdiction based on diverse citizenship and status as a foreigner").

The former kind may be supposed proper for the federal jurisdiction, the latter for that of the states. But it is at least problematical whether an unjust sentence against a foreigner, where the subject of controversy was wholly relative to the *lex loci,* would not, if unredressed, be an aggression upon his sovereign, as well as one which violated the stipulations in a treaty or the general laws of nations. And a still greater objection to the distinction would result from the immense difficulty, if not impossibility, of a practical discrimination between the cases of one complection and those of the other. So great a proportion of the cases in which foreigners are parties involve national questions, that it is by far most safe and most expedient to refer all those in which they are concerned to the national tribunals.

*Id.* See also Note, *A Legal Lohengrin: Federal Jurisdiction Under the Alien Tort Claims Act of 1789,* 14 U.S.F.L.REV. 105, 113–15 & nn. 62–65 (1979). *Cf.* THE FEDERALIST No. 3 (J. Jay), No. 42 (J. Madison).[13]

The First Judiciary Act clearly did not go as far as Hamilton might have hoped. It withheld much of the judicial power that constitutionally might have been granted—for example, federal courts did not have complete federal question jurisdiction until 1875[14]—and enumerated relatively narrow criteria for subject matter jurisdiction. In particular, diversity jurisdiction under the Act kept out of federal court aliens who could not plead the jurisdictional amount or complete diversity. Given the fears articulated by Hamilton and others, it is easy to

speculate that the drafters were worried about possible repercussions from a state's denial of justice to an alien in any action, no matter how slight in monetary value. Recall, in this regard, Hamilton's concerns about any incident, even one "wholly relative to the *lex loci."* THE FEDERALIST No. 80 (A. Hamilton). As Hamilton noted, whatever the fears attaching to "merely" local actions, civil suits also implicating the law of nations were surely fit for federal adjudication. Since the five hundred dollar limit created the potential for mischief by state courts, it would have been logical to place under federal jurisdiction at least the local actions most likely to create international tension. Recalling that each additional statutory grant of federal jurisdiction to lower courts was the product of struggle and compromise, *cf.* Warren, *supra* note 10, at 53–54, it would hardly be surprising that the section 1350 grant, too, reflects a compromise between, on the one hand, placing all actions involving aliens in federal courts and, on the other hand, reserving to state courts exclusive jurisdiction over all civil actions at common law and in equity.

Curiously, the language of the original section 1350, as well as its location in the Judiciary Act, can be construed to support either the *Filartiga* or the alternative formulation for the application of section 1350. As it appeared in section 9 of the 1789 Judiciary Act, the predecessor to section 1350 granted district courts jurisdiction, "concurrent with the courts of the several States, or the circuit courts, as the case may be."[15] A logical inference is that some

---

**13.** This formulation of § 1350's underlying intent casts doubt on the appropriateness of federal jurisdiction over suits between two aliens. The United States might be less concerned about the appearance of condoning a wrongful act if its own citizen were not the perpetrator, because the state of the wrong-doer should provide the forum for relief, or suffer the consequences. However, let us assume a tort is committed by an alien against an alien of different nationality, and the injured alien sues the offender under a state's tort law. No diversity jurisdiction exists. *See Hodgson & Thompson v. Bowerbank,* 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809). A denial of justice might create the perception that the United

States is siding with one party, thereby affronting the state of the other. While the potential for retribution is not direct, it would seem to be present, particularly when the tort occurs on United States soil.

**14.** Act of Mar. 3, 1875, ch. 137, § 1, 18 Stat. 470.

**15.** In the First Judiciary Act, district courts were granted original jurisdiction over a mixture of actions. The complete authorization was as follows:

Sec. 9. *And be it further enacted,* That the district courts shall have, exclusively of

actions cognizable in the circuit courts also were cognizable under section 1350. The carefully delimited diversity jurisdiction of the circuit courts was set out in section 11; that section included the grant of jurisdiction, "of all suits of a civil nature at common law or in equity," in which an alien is a party, and no other grant of civil jurisdiction in actions involving aliens.[16] The section 9 reference to concurrent jurisdiction with the circuit courts therefore might reasonably have referred to actions by an alien "at common law or in equity," for a tort, involving more than five hundred dollars—in other words, to domestic torts cognizable under diversity jurisdiction. However, the reference to concurrent circuit court jurisdiction might also refer to actions implicating the law of nations; both courts would have had jurisdiction over such actions, circuit courts as an element of their common law jurisdiction, and district courts directly. In that case, the mention of concurrent jurisdiction would support the *Filartiga* formulation for the application of section 1350.

The structure of the Act also provides support for both the *Filartiga* and the alternative formulations. A comparison of district and circuit court jurisdiction discloses that while each had its own classes of cases, the circuit courts were the more significant

---

the courts of the several States, cognizance of all crimes and offences that shall be cognizable under the authority of the United states, committed within their respective districts, or upon the high seas; where no other punishment than whipping, not exceeding thirty stripes, a fine not exceeding one hundred dollars, or a term of imprisonment not exceeding six months, is to be inflicted; and shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made, on waters which are navigable from the sea by vessels of ten or more tons burthen, within their respective districts as well as upon the high seas; saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it; and shall also have exclusive original cognizance for all seizures on land, or other waters than as aforesaid, made, and of all suits for penalties and forfeitures incurred, under the laws of the United States. *And shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.* And shall also have cognizance, concurrent as last mentioned, of all suits at common law where the United States sue, and the matter in dispute amounts, exclusive of costs, to the sum or value of one hundred dollars. And shall also have jurisdiction exclusively of the courts of the several States, of all suits against consuls or vice-consuls except for offences above the description aforesaid. And the trial of issues in fact, in the district courts, in all causes except civil causes of admiralty and maritime jurisdiction, shall be by jury.
1 Stat. 73, 76–77 (footnotes omitted) (emphasis added).

16. The circuit courts received much broader original jurisdiction than the district courts. The authorization was as follows:

Sec. 11. *And be it further enacted,* That the circuit courts shall have *original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars,* and the United States are plaintiffs, or petitioners; *or an alien is a party,* or the suit is between a citizen of the State where the suit is brought, and a citizen of another State. And shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the district courts of the crimes and offences cognizable therein. But no person shall be arrested in one district for trial in another, in any civil action before a circuit or district court. And no civil suit shall be brought before either of said courts against an inhabitant of the United States by any original process in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ, nor shall any district or circuit court have cognizance of any suit to recover the contents of any promissory note or other chose in action in favour of an assignee, unless a suit might have been prosecuted in such court to recover the said contents if no assignment had been made, except in cases of foreign bills of exchange. And the circuit courts shall also have appellate jurisdiction from the district courts under the regulations and restrictions herein after provided.
1 Stat. 73, 78–79 (footnotes omitted) (emphasis added).

courts of general original jurisdiction. *See* notes 15 and 16, *supra.* The district court was viewed "primarily as [a] court[ ] of special jurisdiction," 1 J. GOEBEL, HISTORY OF THE SUPREME COURT OF THE UNITED STATES: ANTECEDENTS AND BEGINNINGS TO 1801, at 475 (1971), and "as a very inferior court indeed." *Id.* at 473. The district court judge was to be "the resident expert" on his state's jurisprudence, *id.,* and actions placed in district courts were in essence local. Moreover, district court actions were in some respects minor versions of actions eligible to be brought in the circuit courts. Thus while the circuit courts—staffed by a district court judge and two Supreme Court Justices, pursuant to section 4 of the Act— had exclusive jurisdiction of "all crimes and offenses cognizable under the authority of the United States," with some exceptions, the district courts also had jurisdiction over less serious crimes. Similarly, the district courts could hear actions that did not meet the amount in controversy necessary for circuit court diversity jurisdiction.[17]

While the parallel between greater and lesser punishments and greater and lesser amounts in controversy might be persuasive, the district courts also had admiralty and maritime jurisdiction. That power suggests these courts were not merely local petty action tribunals but important forces in the enforcement of maritime law. The drafters' decision to grant district courts admiralty jurisdiction suggests perhaps that the district courts were perceived as appropriate tribunals to handle matters affecting foreign states. It is perhaps anomalous that drafters concerned that decentralized courts might spark international conflict would place in a local court complete control over actions implicating the laws of nations, rather than using that court solely as a diversity jurisdiction catch-all. However, because district courts were located in each state, while circuit courts were scattered more sparsely, Judiciary Act of 1789, ch. 20, §§ 2–5, 1 Stat. 73, 73–75, district

court jurisdiction also made federal courts more accessible to aliens, and thereby facilitated their actions.

### 2. *A Paradigm of the Alternative Formulation:* Adra v. Clift

To probe the mechanics of the alternative formulation for the application of section 1350, I turn to the single case in which it has been adopted. In *Adra v. Clift,* 195 F.Supp. 857 (D.Md.1961), a Lebanese plaintiff, then Ambassador to Iran, sued his former wife, a Turkish-born Iraqi national resident in the United States, and her American husband under section 1350. The plaintiff contended that he was legally entitled to custody of his daughter by his former wife, that the daughter was wrongfully being withheld from him, and that defendants had concealed the child's name and nationality by falsifying her passport, in violation of the law of nations. The court found jurisdiction to exist by identifying a purely municipal tort—"[t]he unlawful taking or withholding of a minor child from the custody of the parent or parents entitled to such custody." 195 F.Supp. at 862. The court then determined that the defendant had misused her Iraqi passport by including her Lebanese child on it, in order to conceal the child's name and nationality. The misuse of a passport was found to constitute a violation of the law of nations, and jurisdiction was established.

If we change the facts slightly in *Adra v. Clift,* and assume both defendants are American citizens, the case becomes a paradigm of the alternative formulation for the application of section 1350.[18] Diversity jurisdiction is unavailable if the amount in controversy is not met. The action is grounded directly on a domestic tort but implicates an international law violation. If plaintiff were denied justice, that denial might be perceived in Lebanon, plaintiff's

---

**17.** To be sure, the parallel is not perfect, since district courts could hear actions for any amount in controversy if they met the former § 1350's requirements.

**18.** As noted earlier, I have some misgivings about the propriety of § 1350 actions between two aliens under this formulation. *See* note 13, *supra.*

home state, as an affront by the United States itself.

At this juncture it is worthwhile to observe that the second formulation is not susceptible of the same criticism as the first—that the district court would have difficulty parsing the law of nations for an applicable legal standard. It is apparent that because domestic law provides the standard, the burden of discovering that standard is removed. However, the *Adra* case suggests that this formulation raises some thorny questions of its own.

Under the alternative approach suggested by *Adra,* the law of nations violation is only one aspect of a multifaceted jurisdictional test and apparently need not be so rigidly defined as under the first approach adopted by *Filartiga.* The *Filartiga* formulation posits a violation of the law of nations as the trigger for section 1350 jurisdiction. The *Adra* formulation adopts a two-step jurisdictional test, requiring what would appear to be a looser allegation of a law of nations offense, coupled with a municipal tort.[19] That *Adra* eschewed the analysis that would have been required under the *Filartiga* approach, and instead spoke only in general terms about the law of nations, suggests a less rigorous showing under the law of nations would be mandated under the *Adra* approach.

The court in *Adra* might convincingly have argued that passport abuse amounts to a serious law of nations violation. The argument would be that countries are entitled, under the law of nations, to rely on passports as evidence of fact, *see Kent v. Dulles,* 357 U.S. 116, 120–21, 78 S.Ct. 1113, 1115–16, 2 L.Ed.2d 1204 (1958) (quoting *Urtetiqui v. D'Arbel,* 34 U.S. (9 Pet.) 692, 9

L.Ed. 276 (1835)), and that nations that do rely are responsible, also under that law, for the safe passage of the passport holder. *See* 4 BLACKSTONE'S COMMENTARIES 68–69 (Welsby ed. 1854). Fraudulent use by an individual might therefore disrupt states' recognized duties, which are grounded in reliance on a passport's authenticity. Misuse by a person entrusted to abide by international norms would amount to a law of nations violation.

The *Adra* court made no effort to tease out of international law an explicit duty, placed on individuals, that had been violated. Instead, it merely identified the important role that passports play in the international arena, implicitly concluded that the defendants were obliged by the law of nations to adhere to international norms regarding passports, and determined that their failure to do so constituted the requisite violation.

That section 1350 jurisdiction might be triggered by offenses less severe than are required under the *Filartiga* formulation gives rise to a new question: how much less severe? No doubt the law of nations condemns passport violations; whether they reach the level of international crimes is another matter entirely. Perhaps the two approaches focus on different segments of the spectrum of international offenses. In the range from the petty to the heinous, the first formulation might look to the upper range only—to those acts that are recognized as international crimes—while the second might encompass a wider scope. It might, for example, refer to a violation of any of the many duties imposed on nations by international law, as set out in detail in the Restatement (Second) of Foreign Rela-

---

**19.** Because even under this approach the *Hanoch* plaintiffs do not allege a law of nations violation, it is unnecessary to consider Article III implications of the formulation. It would appear, however, that there are no serious Article III problems associated with the *Adra* -type application of § 1350.

If § 1350 is limited to actions by aliens against citizens, *see* note 13, *supra,* then constitutional diversity jurisdiction exists.

If § 1350 is read more broadly to cover alien versus alien suits, it might still be possible to

find that the action arises under the laws of the United States. This is so because the law of nations is "an ingredient" of this action, *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), and is also an integral part of the laws of this country, *see The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). Therefore, since any action under the *Adra* formulation would involve as a threshold issue the law of nations, it would "arise under" the laws of the United States for Article III purposes.

tions Law. That is an issue with which any future court accepting the Adra-type formulation must grapple, however. I need not test the limits of each standard, for while I have no doubt that the official torture cited in *Filartiga* violated the law of nations by any definition, I am not convinced that the unofficial acts at issue in this case in any way implicated the law of nations.

I note, however, that it is thoroughly inconsistent with the impetus behind section 1350 under the *Adra* formulation—to keep the United States *out* of international confrontations—to construe the statute to enable courts to burrow into disputes wholly involving foreign states. I therefore believe the *Adra* formulation makes sense only if construed to cover actions by aliens for domestic torts that occur in the territory of the United States and injure "substantial rights" under international law, *see* 26 Op. Att'y Gen. 250, 252–53 (1907), or for universal crimes, as under the first formulation, or for torts committed by American citizens abroad, where redress in American courts might preclude international repercussions.

Not surprisingly, these limits are consistent with the basic parameters that international law establishes for a domestic court's exercise of jurisdiction over extraterritorial activities. *See* RESTATEMENT OF THE LAW OF FOREIGN RELATIONS (REVISED) §§ 402–404 (Tent.Draft No. 2, 1981) (enumerating permissible bases of "jurisdiction to prescribe," applicable both to criminal and civil law). They are not, contrary to Judge Bork's assertion, my own "unguided policy judgments," but rather the well-established, prudential judgments of the law of nations. Of course, other municipal law doctrines pertaining to a court's exercise of jurisdiction, such as *forum non conveniens* and attainment of personal jurisdiction, must be met as well.

A second difficult question raised by the facts in *Adra* involves the requisite nexus between the domestic and the international tort. The *Adra* court applied, at best, a "but for" causation test to determine whether the international and domestic torts were sufficiently related to establish jurisdiction. "But for" the passport abuse, defendants could not have concealed the daughter's entry into the United States, and therefore could not have retained custody. This framework opens the courts to a potential deluge of actions. In this case, for example, plaintiffs might have alleged that the PLO violated Israeli immigration laws by landing in Israel without passports, perhaps skirting the problem, addressed *infra*, of individual liability for torture. The formulation poses the difficult question of the necessary degree of convergence between the domestic and international tort. Had I to address the issue, I would recall my basic premise—that the intent of the statute was to avoid or mitigate international conflict—and determine what degree of overlap would be required to achieve that goal. However, since the *Hanoch* plaintiffs focus on one event alone, the issue is not directly presented.

C. *A Summary Comparison of the* Filartiga *and* Adra *Formulations*

From the foregoing analysis it is clear that the *Filartiga* and *Adra* formulations might produce radically different results. *Adra v. Clift* itself is an example. Under its facts, jurisdiction would fail under the *Filartiga* formulation, because the law of nations violation, even if sufficiently severe, caused plaintiff no harm, and plaintiff could not sue under section 1350 for the domestic tort. In contrast, the facts of *Filartiga* would likely produce a finding of jurisdiction under either the *Filartiga* or *Adra* formulation. Whatever the difference in the formulations, however, they do have in common one crucial characteristic: under neither one must plaintiffs identify and plead a right to sue granted by the law of nations. On that point, I espy no reason in the statutory language, history, or case law to conclude otherwise.

IV. MEANING OF THE "LAW OF NATIONS"

In addition to our disagreement over the "right to sue" issue, I also have great diffi-

culty in understanding Judge Bork's effort to restrict the scope of section 1350 to the principal offenses against the law of nations recognized centuries ago by Blackstone, see text at notes 2–3, supra, instead of construing it in accord with the current definition of the law of nations. While conceding that the legislative history offers no hint of congressional intent in passing the statute, my colleague infers Congress' intent from the law of nations at the time of the passage of section 1350. The result of this analytical approach is to avoid the dictates of The Paquete Habana and to limit the "law of nations" language to its 18th century definition. In The Paquete Habana, the Supreme Court noted that, in construing the "law of nations,"

> where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

175 U.S. at 700, 20 S.Ct. at 299. As was pointed out in Filartiga,

> Habana is particularly instructive for present purposes, for it held that the traditional prohibition against seizure of an enemy's coastal fishing vessels during wartime, a standard that began as one of comity only, had ripened over the preceding century into "a settled rule of international law" by "the general assent of civilized nations." Id. at 694, 20 S.Ct. at 297; accord, id. at 686, 20 S.Ct. at 297. Thus it is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today. See Ware v. Hylton, 3 U.S. (3 Dall.) 198, 1

L.Ed. 568 (1796) (distinguishing between "ancient" and "modern" law of nations). 630 F.2d at 881.

In light of the evidence at hand, it seems clear beyond cavil that violations of the "law of nations" under section 1350 are not limited to Blackstone's enumerated cffenses. Indeed, the Supreme Court stated as much almost a century ago, when it announced that counterfeiting of foreign securities constitutes an offense against the law of nations. See United States v. Arjona, 120 U.S. 479, 7 S.Ct. 628, 30 L.Ed. 728 (1887).

V. THE DUTY TO EXERCISE JURISDICTION

To the extent that Judge Bork rejects the Filartiga construction of section 1350 because it is contrary to his perception of the appropriate role of courts, I believe he is making a determination better left to Congress. It simply is not the role of a judge to construe a statutory clause out of existence merely on the belief that Congress was ill-advised in passing the statute. If Congress determined that aliens should be permitted to bring actions in federal courts, only Congress is authorized to decide that those actions "exacerbate tensions" and should not be heard.

To be sure, certain judge-made abstention rules, such as the Act of State Doctrine, require courts to decline to reach certain issues in certain instances, notwithstanding a statutory grant of jurisdiction. Where the Act of State Doctrine applies, the Supreme Court has directed the courts not to inquire into the validity of the public acts of a recognized foreign sovereign committed within its own territory. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). The doctrine does not require courts to decline jurisdiction, as does the Foreign Sovereign Immunities Act, but only not to reach the merits of certain issues. As Judge Bork admits, the doctrine is not controlling here. Indeed, to apply it at this stage of the case would be to grossly distort the doctrine, first by considering it as a jurisdictional issue, and second, by extend-

ing it beyond its carefully limited confines. Unless and until the Supreme Court reconsiders the Act of State Doctrine and applies it as a jurisdictional matter to acts by non-recognized entities committed in the territory of a recognized state, it simply is not relevant to this case.

While not claiming that the Act of State Doctrine controls, Judge Bork looks for guidance toward the concerns that he believes animate it. To ignore the Supreme Court's cautious delineation of the doctrine in *Banco Nacional de Cuba v. Sabbatino* and its progeny, and to cite the doctrine's rationale as broad justification for effectively nullifying a statutory grant of jurisdiction, is, to my view, an inappropriate exercise of lower federal court power. It is particularly so in this case, given the considerable disagreement among the Justices regarding the rationale, scope, and flexibility of the doctrine, *see First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 773–76, 92 S.Ct. 1808, 1816–17, 32 L.Ed.2d 466 (1972) (Powell, J., concurring in judgment), and congressional efforts to override judicial abdication of the kind directed by the Act of State Doctrine. *See* 22 U.S.C. § 2370(e) (1976) (barring judicial invocation of Act of State Doctrine in certain expropriation actions).

My troubles with Judge Bork's efforts to limit the reach of section 1350 go even deeper. Contrary to my colleague's intimations, I do recognize that there are separate branches of Government. In fact, that is precisely my point. I am the first to admit that section 1350 presents difficulties in implementation, but to construe it out of existence on that ground is to usurp Congress' role and contravene its will.

Judge Bork virtually concedes that he is interposing a requirement that the law of nations provide a right to sue simply to void a statute of which he does not approve— and to avoid having to extend and distort existing doctrine on nonjusticiability to reach the same result. As a first step, he sets forth an interpretation of the statute that completely writes out of the statute the clause at issue. The law of nations provides no private right to sue for the only offenses against the law of nations that he recognizes. Under his view, therefore, the clause in the statute had no meaning when passed by Congress and none today. To enforce a construction that yields that result is not only to insult Congress, but inappropriately to place judicial power substantially above that of the legislature.

Logically, of course, under Judge Bork's formulation, were the law of nations ever to provide a right to sue, federal courts would have to hear the cases. To avoid this contingency, Judge Bork adds yet another obstacle, stating that "considerations of justiciability" would, necessarily, come into play in that event. With this remark, Judge Bork virtually concedes that he would keep these cases out of court under any circumstance, and he places himself squarely beside Judge Robb, who advocates dismissal of this action on political question grounds. Vigorously waving in one hand a separation of powers banner, ironically, with the other he rewrites Congress' words and renounces the task that Congress has placed before him.

Most surprisingly, Judge Bork's analysis—and his critique of my own—*completely* overlooks the existence of state courts. Subject to the same constraints that face federal courts, such as personal jurisdiction, and perhaps in some instances to other limitations, such as preemption, state courts could hear many of the common law civil cases, brought by aliens, that Judge Bork believes should not be heard at all. As best we can tell, the aim of section 1350 was to place in federal court actions potentially implicating foreign affairs. The intent was not to provide a forum that otherwise would not exist—as Judge Bork assumes— but to provide an *alternative* forum to state courts. Indeed, the Supreme Court has at least twice cited section 1350 as a statutory example of congressional intent to make questions likely to affect foreign relations originally cognizable in federal courts. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427 & n. 25, 84 S.Ct. 923, 939 & n. 25, 11 L.Ed.2d 804 (1964); *Ex Parte Quirin,*

317 U.S. 1, 27–30 & n. 6, 63 S.Ct. 1, 10–12 & n. 6, 87 L.Ed. 3 (1942). Not only is it patently indefensible to ignore this mandate. It is also erroneous to assume that the troublesome cases will disappear altogether from state courts, as well as federal, if section 1350 becomes mere historical trivia. In that event, no doubt, my colleagues would either assert nonjusticiability generally or turn the issue on its head and argue, precisely as the section 1350 drafters recognized, that state courts are inappropriate fora for resolution of issues implicating foreign affairs.

## VI. LIABILITY OF THE NON-STATE ACTOR UNDER THE LAW OF NATIONS

While I endorse the legal principles set forth in *Filartiga,* I also believe the factual distinctions between this case and the one faced by the Second Circuit mitigate its precedential value in this case. To be sure, the parallels between the two cases are compelling. Here, as in *Filartiga,* plaintiffs and defendants are both aliens. Plaintiffs here allege torture in their complaint, as did plaintiffs in *Filartiga.*[20] Here, as in *Filartiga,* the action at issue undoubtedly violated the law of the nation in which it occurred (in this case, the law of Israel). *See Filartiga,* 630 F.2d at 889.

The two fact patterns diverge, however, on the issue of *official torture.* The Palestine Liberation Organization is not a recognized state, and it does not act under color of any recognized state's law. In contrast, the Paraguayan official in *Filartiga* acted under color of state law, although in violation of it. The Second Circuit surveyed the law of nations and concluded that *official torture* constituted a violation. Plaintiffs in the case before us do not allege facts to show that official or state-initiated torture is implicated in this action. Nor do I think they could, so long as the PLO is not a recognized member of the community of nations.[21]

**20.** On the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: torture, summary execution, genocide and slavery. *See* Blum & Steinhardt, *Federal Jurisdiction over International Human Rights Claims: The Alien Tort Claims Act after Filartiga* v. Pena-Irala, 22 HARV.INT'L L.J. 53, 90 (1981); *see also* P. SIEGHART, THE INTERNATIONAL LAW OF HUMAN RIGHTS 48 (1983) (cataloguing as recognized international crimes certain war crimes, crimes against humanity, genocide, apartheid and, increasingly, torture). Plaintiffs in this action allege both torture and murder that amounts to summary execution. *Filartiga* accepted the view that official torture in fact amounts to a law of nations violation. Analysis along the same lines would likely yield the conclusion that state-sponsored summary executions are violations as well. However, by definition, summary execution is "murder conducted in uniform," as opposed to lawful, state-imposed violence, Blum & Steinhardt, *supra,* at 95, and would be inapplicable here. *See id.* at 95–96. Therefore, for purposes of this concurrence, I focus on torture and assume, *arguendo,* that torture amounts to a violation of the law of nations when perpetrated by a state officer. I consider only whether non-state actors may be held to the same behavioral norms as states.

**21.** Our courts have in the past looked to the foreign policy of this nation, in particular to the recognition or non-recognition of a foreign government, to determine the applicability of a given legal doctrine. For example, in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court explicitly tied the application of the Act of State Doctrine to whether the foreign state was recognized by the United States. *See* 376 U.S. at 401, 428, 84 S.Ct. at 926, 940. *See also Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (Supreme Court takes judicial notice of Washington's recognition of Mexican government, applies Act of State Doctrine retroactively to pre-recognition incidents). Indeed, the Court has made clear that the judiciary is not to second guess the determination of the other branches as to "[w]ho is the sovereign, *de jure* or *de facto,* of a territory." *Oetjen,* 246 U.S. at 302, 38 S.Ct. at 311. We therefore are bound by the decision of the Executive not to recognize the PLO, and we must apply international law principles accordingly.

I note, however, that it is conceivable that a state not recognized by the United States is a state as defined by international law and therefore bound by international law responsibilities. To qualify as a state under international law, there must be a people, a territory, a government and a capacity to enter into relations with other states. *See* 3 U.N. SCOR (383d Mtg.) at 9–12, U.N. Doc. S/P.V. 383, pp. 21–35 (1948) (remarks of Professor Philip C. Jessup advocating Israeli membership in the

## A. The Lack of Consensus on Individual Responsibility

The question therefore arises whether to stretch *Filartiga*'s reasoning to incorporate torture perpetrated by a party other than a recognized state or one of its officials acting under color of state law. The extension would require this court to venture out of the comfortable realm of established international law—within which *Filartiga* firmly sat—in which states are the actors.[22] It would require an assessment of the extent to which international law imposes not only rights but also obligations on individuals. It would require a determination of where to draw a line between persons or groups who are or are not bound by dictates of international law, and what the groups look like. Would terrorists be liable, because numerous international documents recognize their existence and proscribe their acts? *See generally* R. LILLICH, TRANSNATIONAL TERRORISM: CONVENTIONS AND COMMENTARY (1982) (reprinting numerous international anti-terrorism accords); *see also* Lauterpacht, *The Subjects of the Law of Nations (pt. 1)*, 63 L.Q. REV. 438, 444–45 (discussing international obligations of insurgents). Would all organized political entities be obliged to abide by the law of nations? Would *everybody* be liable? As firmly established as is the core principle binding states to customary international obligations, these fringe areas are only gradually emerging and offer, as of now, no obvious stopping point. Therefore, heeding the warning of the Supreme Court in *Sabbatino,* to wit, "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it," 376 U.S. at 428, 84 S.Ct. at 940. I am not prepared to extend the definition of the "law of nations" absent direction from the Supreme Court. The degree of "codification or consensus" is simply too slight.

While I do not believe that international harmony exists on the liability of private individuals, it is worth noting that a number of jurists and commentators either have assumed or urged that the individual is a subject of international law. *See Lopes v. Reederei Richard Schroder,* 225 F.Supp. 292, 297 (E.D.Pa.1963) (violation of law of nations, in section 1350, means, "at least a violation by one or more individuals"); *Adra v. Clift,* 195 F.Supp. 857 (D.Md.1961) (individual violation of law of nations); Judgment of the International Military Tribunal, 22 Trial of the Major War Criminals Before the International Military Tribunal, Proceedings, 411, 465–66 (1948), 41 AM.J. INT'L L. 172, 220–21 (1947) (international law "imposes duties and liabilities upon individuals as well as upon States"), *reprinted in* The Nuremberg Trial 1946, 6 F.R.D. 69, 110–11 (1947); G.A.Res. 95, UN.Doc. A/64/Add. 1, at 188 (1947) (affirming Nuremberg principles); *see also* Sohn, *supra* note 22, at 9–11 (summarizing shift since 1945 in individual rights and duties under international law); Note, *The Law of Na-*

United Nations), *quoted in* Liang, *Notes on Legal Questions Concerning the United Nations,* 43 AM.J.INT'L L. 288, 300 (1949). Jurisdiction over the territory must be exclusive. G. VON GLAHN, LAW AMONG NATIONS 62 (4th ed. 1981). Even assuming, *arguendo,* that the law of nations obligates unrecognized states that meet this standard, and that § 1350's intent was to hold liable even those states the U.S. does not recognize, there is no allegation here that the PLO does or could meet this standard.

22. Classical international law was predominantly statist. The law of nations traditionally was defined as "the body of rules and principles of action which are binding *upon civilized states* in their relations with one another." J. BRIERLY, *supra* note 11, at 1 (emphasis added); *see also* G. VON GLAHN, *supra* note 21, at 61–62;

1 C. HYDE, INTERNATIONAL LAW CHIEFLY AS INTERPRETED AND APPLIED BY THE UNITED STATES § 2A, at 4 (2d ed. rev. 1945). Non-state actors could assert their rights against another state only to the extent that their own state adopted their claims, and as a rule they had no recourse against their own government for failure to assist or to turn over any proceeds. 1 C. HYDE, *supra,* § 11B, at 36. *See also* Sohn, *The New International Law: Protection of the Rights of Individuals Rather than States,* 32 AM.U.L.REV. 1, 9 (1982). That the International Court of Justice permits only party-states to appear in cases before the court highlights this outlook. Article 34(1), Statute of the International Court of Justice, *done* June 26, 1945, 59 Stat. 1055, T.S. No. 993, 3 Bevans 1153 (entered into force for United States October 24, 1945).

tions in the District Courts: Federal Jurisdiction Over Tort Claims by Aliens Under 28 U.S.C. § 1350, 1 B.C.Int'l & Comp. L.J. 71, 82 (1977). Confusion arises because the term "individual liability" denotes two distinct forms of liability. The first, now well-implanted in the law of nations, refers to individuals acting under color of state law. Commentators routinely place the origin of this development at the Nuremberg Trials, see, e.g., Sohn, supra note 22, at 9–11, and it was in this context that the International Military Tribunal wrote of individual responsibility for war crimes.[23] The second, currently less-established meaning addresses the responsibility of individuals acting separate from any state's authority or direction. That the defendant in Filartiga was an official, not the state itself, placed him squarely within the first meaning. In contrast, in the case before us, the second formulation of individual liability is at issue.

Even in the truly private arena there is support for the concept of individual responsibility. Inferences from case law suggest that courts over the years have toyed with the notion of truly individual liability both under section 1350 and more generally. Section 1350 case law, unfortunately, is sparse. Other than Filartiga, only two cases brought under section 1350 have established jurisdiction. Both involved private-party defendants. In one, Bolchos v. Darrell, 3 Fed.Cas. 810 (D.S.C.1795) (No. 1607), a predecessor to section 1350 provided jurisdiction for an action, grounded on a

treaty violation, involving a title dispute concerning neutral property on a captured enemy vessel. It is worthwhile to note that, although Bolchos involved a treaty obligation, at the time of the Bolchos case individual defendants were in fact found to violate the law of nations, although not necessarily in actions based on section 1350. See, e.g., United States v. Smith, 18 U.S. (5 Wheat.) 153, 5 L.Ed. 57 (1820) (indictment for crime of piracy, as defined by the law of nations). In a more recent case, Adra v. Clift, 195 F.Supp. 857 (D.Md.1961), an individual was in fact found to have violated the law of nations, and section 1350 jurisdiction was thereby established. The action, discussed extensively, supra, involved a child custody suit between two aliens; the court found that defendant's wrongful withholding of custody was a tort and that her misuse of passports to bring the child into the United States violated international law. To reach this conclusion on individual responsibility, the court relied primarily on one commentator, who asserted that some acts violate the law of nations and may be prosecuted when committed by a private offender, Adra, 195 F.Supp. at 863–64 (citing 1 C. Hyde, supra note 22, § 11A, at 33–34); it then leapt to a conclusion that passport violations are among such acts. Id. at 864–65. As I shall demonstrate, infra, Hyde's position, while certainly compelling, is not so widely accepted doctrinally or practically as to represent the consensus among nations.[24]

---

**23.** For example, responding to a "following orders" defense, the court cited Article 8 of the Charter annexed to the agreement establishing the Nuremberg Tribunal, which declared, "The fact that the defendant acts pursuant to orders of his Government or a superior shall not free him from responsibility, but may be considered in mitigation of punishment." 6 F.R.D. at 110–11.

**24.** Three other cases have suggested jurisdiction might be available under § 1350. Of these, two implicated private defendants. In Nguyen Da Yen v. Kissinger, 528 F.2d 1194 (9th Cir.1975), an action against the Immigration and Naturalization Service and others alleging the illegal seizure and removal of Vietnamese babies from Vietnam in the final hours of U.S. involvement there, the court noted in

dicta that jurisdiction might be available under § 1350, and that, if it were, private adoption agencies that participated in the "babylift" might be joined as joint tortfeasors. Id. at 1201 n. 13. In a 1907 Opinion, 26 Op. Att'y Gen. 250 (1907), the Attorney General indicated that a predecessor to § 1350 might provide a forum to Mexican citizens seeking redress for damages suffered when an American irrigation company altered the channel of the Rio Grande River. The third case, O'Reilly de Camara v. Brooke, 209 U.S. 45, 28 S.Ct. 439, 52 L.Ed. 676 (1908), suggests that a United States officer's seizure of an alien's property in a foreign country might fall within § 1350.

Numerous other § 1350 actions have been dismissed on jurisdictional grounds for failure to allege a violation of the law of nations, see

## B. Historical Evolution of the Role of the Individual in International Law

That the individual's status in international law has been in flux since section 1350 was drafted explains in part the current mix of views about private party liability. Through the 18th century and into the 19th, writers and jurists believed that rules of international law bound individuals as well as states. *See, e.g., United States v. Smith,* 18 U.S. (5 Wheat.) 153, 5 L.Ed. 57 (1820) (piracy violates law of nations; individual liable); *Respublica v. DeLongchamps,* 1 U.S. (1 Dall.) 111, 1 L.Ed. 59 (1784) (assault on French consul-general violates law of nations; individual liable); 4 BLACKSTONE'S COMMENTARIES 66–73 (Welsby ed. 1854) (recounting various offenses against law of nations, committed by private persons, punishable under English·statutory law); *see generally* Dickinson, *supra* note 10, at 26–27, 29–30; Dickinson, *The Law of Nations as Part of the National Law of the United States (pt. 2),* 101 U.PA.L.REV. 792, 792–95 (1953); Korowicz, *The Problem of the International Personality of Individuals,* 50 AM.J.INT'L L. 533, 534 (1956).· In the 19th century, the view emerged that states alone were subjects of international law, and they alone were able to assert rights and be held to duties devolved from the law of nations. Under that view—which became firmly entrenched both in doctrine and in practice, *see* Korowicz, *supra,* 50 AM.J.INT'L L. at 535, 541—individual rights existed only as rights of the state, *see* Lauterpacht, *The Subjects of the Law of Nations (pt. 1),* 63 L.Q.REV. 438, 439–40 (1947), and could be asserted, defended or withdrawn by the state. *See* P. REMEC, THE POSITION OF THE INDIVIDUAL IN INTERNATIONAL LAW ACCORDING TO GROTIUS AND VATTEL 38 (1960); *see also* note 22, *supra.*

In this century, once again writers have argued that both the rights and duties of international law should be applied to private parties. *See* P. REMEC, *supra,* at 8–18;

Hill, *International Affairs: The Individual in International Organization,* 28 AM.POL. SCI.REV. 276, 282 & nn. 20–23 (1934) (describing shift from statism and emergence of view that individual is subject of international law); Korowicz, *supra,* 50 AM.J.INT'L L. at 537–39 (observing trend toward recognition of international personality of individuals, especially in their assertion of rights). However, their discussions are more prescriptive than descriptive; they recognize shifts in firmly entrenched doctrine but are unable to define a clear new consensus. And for each article sounding the arrival of individual rights and duties under the law of nations, another surveys the terrain and concludes that there is a long distance to go. *See, e.g.,* Brownlie, *The Place of the Individual in International Law,* 50 VA.L.REV. 435 (1964).

## C. Whether Torture, Like Piracy, Is an Exception to the Rule

One strand of individual liability apparently survived the 19th century swing toward statism—private responsibility for piracy. It remained, with only a handful of other private acts, such as slave trading, as a confutation of the general principle of statism. *See* Korowicz, *supra,* 50 AM.J.INT'L L. at 545, 558; *cf.* Lauterpacht, *The Subjects of the Law of Nations (pt. 2),* 63 L.Q. REV. 438, 441–42. Explanations of the basis for this continued recognition of individual responsibility vary. In one view, these acts are private violations of the law of nations, *e.g., United States v. Smith,* 18 U.S. (5 Wheat.) 153, 161–62, 5 L.Ed. 57 (1820). In another view, international law merely authorizes states to apply sanctions of their municipal law, whatever the nationality of the offender. "The state of the offender is not authorized to apply normal consular or diplomatic protection. International provisions against [acts such as piracy] . . . allow the state which captures the offenders to

---

*generally* Annot., 34 A.L.R. FED. 388 (1977) (reviewing cases). The most common shortcoming of these actions is in the allegation of a municipally recognized tort, such as fraud, *Trans-Continental Inv. Corp., S.A. v. Bank of*

*Commonwealth,* 500 F.Supp. 565 (C.D.Cal. 1980), or libel, *Akbar v. New York Magazine Co.,* 490 F.Supp. 60 (D.D.C.1980), that does not have the stature of a law of nations violation.

proceed according to its own internal law." Korowicz, *supra,* 50 AM.J.INT'L L. at 545. *See also Harvard Research in International Law, Piracy,* 26 AM.J.INT'L L.SUPP. 739, 754, 759–60 (1932) (piracy a special ground of state jurisdiction); *see generally* Dickinson, *Is the Crime of Piracy Obsolete?,* 38 HARV. L.REV. 334 (1925) (discussing doctrinal confusion about piracy as an international or municipal crime).

It is worthwhile to consider, therefore, whether torture today is among the handful of crimes to which the law of nations attributes individual responsibility. Definitions of torture set out in international documents suggest it is not. For example, torture is defined in the Draft Convention on the Elimination of Torture in part as any act "by which severe pain or suffering" is inflicted, "when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Report of the Working Group on a Draft Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (E/CN.4/L 1576) of 6 March 1981, *reprinted in* P. SIEGHART, *supra* note 20, § 14.3.5, at 162. Similarly, the United Nations General Assembly definition requires that the actor be "a public official." *See* Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N.GAOR Supp. (No. 34) at 91–92, U.N.Doc. A/10034 (1975), *reprinted in* P. SIEGHART, *supra* note 20, § 14.3.5, at 162. *See· also* Blum & Steinhardt, *supra* note 20, at 93, 95–96. Against this background, I do not believe the consensus on non-official torture warrants an extension of *Filartiga.* While I have little doubt that the trend in international law is toward a more expansive allocation of rights and obligations to entities other than states, I decline to read section 1350 to cover torture by non-state actors, absent guidance from

the Supreme Court on the statute's usage of the term "law of nations."

## VII. TERRORISM AS A LAW OF NATIONS VIOLATION

I turn next to consider whether terrorism is itself a law of nations violation.[25] While this nation unequivocally condemns all terrorist attacks, that sentiment is not universal. Indeed, the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus. Unlike the issue of individual responsibility, which much of the world has never even reached, terrorism has evoked strident reactions and sparked strong alliances among numerous states. Given this division, I do not believe that under current law terrorist attacks amount to law of nations violations.

To witness the split one need only look at documents of the United Nations. They demonstrate that to some states acts of terrorism, in particular those with political motives, are legitimate acts of aggression and therefore immune from condemnation. For example, a resolution entitled "Basic principles of the legal status of the combatants struggling against colonial and alien domination and racist regimes," G.A.Res. 3103, 28 U.N. GAOR at 512, U.N.Doc. A/9102 (1973), declared:

> The struggle of peoples under colonial and alien domination and racist regimes for the implementation of their right to self-determination and independence is legitimate and in full accordance with the principles of international law.

It continued that armed conflicts involving such struggles have the full legal status of international armed conflicts, and that violation of that status "entails full responsibility in accordance with norms of international law." *Id.* at 513. *See also* Definition of Aggression, G.A.Res. 3314, 29 GAOR Supp. (No. 31) at 142–44, U.N.Doc. A/9631 (1974) (nothing in definition of term "aggression" should prejudice right of self-de-

---

**25.** At least one law review note has suggested that we decide this case in favor of plaintiffs by identifying terrorism as a law of nations violation. *See* Note, *Terrorism as a Tort in Violation of the Law of Nations,* 6 FORDHAM INT'L L.J. 236 (1982).

termination or struggle, particularly of peoples under "colonial and racist regimes or other forms of alien domination"). In contrast, there is of course authority in various documents and international conventions for the view that terrorism is an international crime. Many Western nations condemn terrorist acts, either generally, as in the Convention to Prevent and Punish the Acts of Terrorism Taking the Forms of Crime Against Persons and Related Extortion That Are of International Significance,[26] or with reference to particular terrorist acts, as in the International Convention Against the Taking of Hostages,[27] or the Hague Convention on the Suppression of Unlawful Seizure of Aircraft.[28] See also R. FRIEDLANDER, TERROR-VIOLENCE: ASPECTS OF SOCIAL CONTROL 38 (1983) (describing the international division on the legitimacy of terrorist acts); see generally R. LILLICH, TRANSNATIONAL TERRORISM: CONVENTIONS AND COMMENTARY (1982).

The divergence as to basic norms of course reflects a basic disagreement as to legitimate political goals and the proper method of attainment. Given such disharmony, I cannot conclude that the law of nations—which, we must recall, is defined as the principles and rules that states feel themselves bound to observe, and do commonly observe [29]—outlaws politically motivated terrorism, no matter how repugnant it might be to our own legal system.

### VIII. MY COLLEAGUES' OPINIONS

My colleague Judge Robb argues that this case is a nonjusticiable "political question" and that it therefore was properly dismissed. With all due respect, I disagree with this approach to appellate adjudication. A judge should not retreat under facile labels of abstention or nonjusticiability, such as the "political question doctrine," merely because a statute is ambiguous. In the words of one eminent jurist, "[o]bscurity of statute or of precedent or of customs or of morals, or collision between some or all of them, may leave the law unsettled, and cast a duty upon the courts to declare it retrospectively in the exercise of a power frankly legislative in function." B. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 128 (1921) (emphasis added). Or, as another jurist framed the issue, "The intrinsic difficulties of language and the emergence after enactment of situations not anticipated by the most gifted legislative imagination, reveal doubts and ambiguities in statutes that compel judicial construction." Frankfurter, Some Reflections on the Reading of Statutes, 47 COLUM.L.REV. 527, 529 (1947).

Nonjusticiability based upon "political question" is at best a limited doctrine, and it is wholly inapposite to this case. In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court held that the question whether a state legislative district apportionment plan violates the Constitution is not a political question and therefore not nonjusticiable. In so doing, the Court rejected the notion that the doctrine rendered nonjusticiable all "political cases"—a doctrine advanced by Justice Frankfurter writing for a plurality of the Court in Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Instead, it observed, the nonjusticiability of a question is "essentially a function of the separation of powers." 369 U.S. at 217, 82 S.Ct. at 710. The Court then identified several categories of political questions:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy

---

26. Signed Feb. 2, 1971, 27 U.S.T. 3949, T.I.A.S. No. 8413 (entered into force for United States Oct. 20, 1976).

27. Adopted Dec. 17, 1979, G.A.Res. 34/146, 34 U.N. GAOR Supp. (No. 39), U.N. Doc. A/34/819 (1979).

28. Signed Dec. 16, 1970, 22 U.S.T. 1641, T.I. A.S. No. 7192, 860 U.N.T.S. 105 (entered into force for United States Oct. 18, 1971).

29. 1 C. HYDE, supra note 22, at 1.

determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* The opinion also observed that the doctrine in no respect requires that all questions implicating foreign affairs be ruled political questions. *Id.* at 211, 82 S.Ct. at 706.

Subsequently Justice Brennan, the author of *Baker v. Carr,* emphasized the narrowness of the political question doctrine as it applies to matters of foreign relations. Dissenting in *Goldwater v. Carter,* 444 U.S. 996, 1006, 100 S.Ct. 533, 538, 62 L.Ed.2d 428 (1979)—in which only four Justices agreed that a Congressman's challenge to the President's Taiwan treaty termination presented a nonjusticiable political question—Justice Brennan explained, "Properly understood, the political-question doctrine restrains courts from reviewing an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been 'constitutional[ly] commit[ted].'" *Id.* at 1006, 100 S.Ct. at 538 (quoting *Baker v. Carr,* 369 U.S. 186, 211–13, 82 S.Ct. 691, 706–08, 7 L.Ed.2d 663 (1962)) (brackets in original). I simply do not believe that the doctrine in either of these narrow formulations counsels a finding of nonjusticiability in this case.

Initially, the action before us does not implicate separation of powers principles, and therefore is not even related to the central concern of the political question doctrine. *See Baker v. Carr,* 369 U.S. at 210, 217, 82 S.Ct. at 706, 710. We have here no clash between two branches of government that requires us to resolve the apportionment of power between them. Nor do we potentially transgress by reviewing any exercise of authority by another branch of government, much less one committed to another branch by the Constitution. Far from it, in fact; in implementing section 1350, courts merely carry out the existing view of the legislature that federal courts should entertain certain actions that implicate the law of nations.[30] Moreover, none of the categories identified in *Baker* is applicable here. We do not lack judicially discoverable and manageable standards. The parties do not invoke constitutional or statutory provisions that resist judicial application. The Supreme Court, in *The Paquete Habana,* explicitly acceded to the task of applying the law of nations and instructed lower courts on how to approach the task of discovering it. I therefore can hardly conclude that courts *lack* the means of determining what standards to apply. That the task might be difficult should in no way lead to the conclusion that it should not be accomplished. Nor do I believe either that

---

**30.** To the extent that Judge Robb's reliance on political question principles arises from his concern about court intervention in foreign affairs, the Act of State Doctrine delineates the bounds of proper judicial restraint. The doctrine arises in cases which, under Judge Robb's formula, would be deemed political question cases. Yet, we cannot ignore the fact that they are not treated as political question cases and ruled nonjusticiable.

The doctrine applies only to judicial review of the acts of *recognized* foreign governments committed *within their own territory. See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). It is, in effect, a doctrine of deference, requiring that courts not second-guess the judgments of such sovereigns in a category of contexts. When a § 1350 action implicates such action by a recognized sovereign, the Act of State Doctrine might bar further inquiry. Such is not the case here. Similarly, the Foreign Sovereign Immunities Act restrains courts from asserting jurisdiction, but, again, only to the extent Congress has deemed appropriate. Considering that the Supreme Court—in the Act of State Doctrine—and the Congress—in the Foreign Sovereign Immunities Act—have each delimited the scope of necessary judicial restraint in cases involving foreign affairs, I am not inclined to fashion yet another doctrine of nonjusticiability simply because this case, and the intricacies of the law of nations, are not of easy resolution or implicate foreign affairs generally.

any of the other concerns in *Baker* arise here.[31]

I note, in addition, that to expand the doctrine at this juncture would be to counter the movement of courts and scholars in the opposite direction. Indeed, commentators have noted the "judicial indifference and scathing scholarly attack" recently directed at the political question doctrine, *see* McGowan, *Congressmen in Court*, 15 GA.L. REV. 241, 256 (1981). As Judge McGowan has noted, other than the Taiwan treaty case, *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), the last Supreme Court case to cite the doctrine in any meaningful way was *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), and the last Supreme Court case to rely squarely on it was *Colegrove v. Green*, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). *See* McGowan, *supra*, at 256–57.

It is therefore clear that the political question doctrine is a very limited basis for nonjusticiability. It certainly does not provide the judiciary with a carte blanche license to block the adjudication of difficult or controversial cases. And the doctrine surely may not be employed here to vitiate section 1350.

I decline to address further Judge Bork's critique of my opinion. He has completely misread my opinion to say that the primary purpose of section 1350 was to authorize courts to "regulate the conduct of other nations and individuals abroad, conduct without an effect upon the interests of the United States." I only wish the issues

posed were so simple. Judge Bork seriously distorts my basic premises and ignores my expressed reservations. Accordingly, I prefer to let this opinion speak for itself, in the belief that it belies my colleague's mischaracterizations, and that any further exposition would be redundant.

IX. CONCLUSION

In light of the foregoing, I conclude that the appellants have not, and could not, allege facts sufficient to remain in court under existing precedent. I therefore vote to affirm the District Court's dismissal for lack of subject matter jurisdiction.

BORK, Circuit Judge, concurring:

This case grows out of an armed attack on a civilian bus in Israel on March 11, 1978. Appellants (plaintiffs below) are sixty-five of the persons seriously injured in the attack and the survivors of twenty-nine of the persons killed. Appellees (defendants below) are the Libyan Arab Republic ("Libya"), the Palestine Liberation Organization ("PLO"), the Palestine Information Office ("PIO"), and the National Association of Arab Americans ("NAAA").[1] Appellants alleged in their complaint that appellees were responsible for the 1978 attack, and they sought compensatory and punitive damages. Specifically, appellants charged appellees with torts committed in violation of international law and of some treaties and statutes of the United States as well as with commission of and conspiracy to commit various intentional common law torts. Jurisdiction over the common law tort

---

31. This case therefore is distinguishable from *Crockett v. Reagan*, 720 F.2d 1355 (D.C.Cir. 1983), in which a panel of this court recently affirmed the dismissal of an action on political question grounds. In *Crockett*, we held that the inquiry into whether United States advisers stationed in El Salvador were in a situation of imminent hostilities was beyond the fact-finding power of this court and hence constituted a political question. That case, unlike this one, involved the apportionment of power between the executive and legislative branches. The case was brought by a group of Congressmen challenging the President's failure to report to Congress under the War Powers Resolution. Our opinion adopted that of the District Court,

which had articulated an extremely narrow view of the political question doctrine. Even within that narrow view, it was apparent that *Baker v. Carr's* category of "judicially discoverable and manageable standards" would bar judicial interference in the dispute between two branches. Here we have no such dispute and no such fact-finding problems and, therefore, no legitimate grounds for a finding of nonjusticiability.

1. Appellants have not pursued the appeal against a fifth defendant named in the complaint, the Palestine Congress of North America ("PCNA").

counts is pendent and will fail if the other counts fail.

The district court dismissed the action for lack of subject matter jurisdiction.[2] *Hanoch Tel-Oren v. Libyan Arab Republic,* 517 F.Supp. 542 (D.D.C.1981). We agree that the complaint must be dismissed, although our reasons for agreement differ. I believe, as did the district court, that, in the circumstances presented here, appellants have failed to state a cause of action sufficient to support jurisdiction under either of the statutes on which they rely. 28 U.S.C. §§ 1331, 1350 (1976 & Supp. V 1981).[3] Neither the law of nations nor any of the relevant treaties provides a cause of action that appellants may assert in courts of the United States. Furthermore, we should not, in an area such as this, infer a cause of action not explicitly given. In reaching this latter conclusion, I am guided chiefly by separation of powers principles, which caution courts to avoid potential interference with the political branches' conduct of foreign relations.

I.

According to the complaint, on March 8, 1978, thirteen heavily armed members of the PLO left Lebanon for Israel. They were under instructions from the PLO to seize and hold Israeli civilians in ransom for the release of PLO members incarcerated in Israel jails. If their plans broke down, the terrorists were to kill their hostages.

The complaint's allegations of what happened upon the terrorists' arrival in Israel constitute a tale of horror. Since my analysis does not turn upon the particulars of those events, they need not be described in detail. The thirteen terrorists landed by boat and, after killing an American photographer they encountered on the beach, made their way to the main highway between Haifa and Tel Aviv. There they stopped and seized a civilian bus, a taxi, a passing car, and, later, a second civilian bus, taking the passengers hostage. While proceeding toward Tel Aviv with their many hostages gathered in the first bus, the terrorists fired on and killed numerous occupants of passing cars as well as some of their own passengers. They also tortured some of their hostages.

The police finally brought the terrorist-controlled bus to a halt by shooting at the tires and engine of the bus as it passed through a police barricade. The terrorists reacted by shooting a number of their hostages and, eventually, by blowing up the bus with grenades. As a result of the terrorists' actions, twenty-two adults and twelve children were killed, and sixty-three adults and fourteen children were seriously wounded.

Appellants in this case are most of those wounded and the survivors of most of those killed, as well as the guardians and next friends of those wounded minors who may not sue in their own capacity. Appellants alleged their complaint that appellees are responsible for the deaths and injuries. According to the complaint's allegations, the PLO not only recruited and trained the thirteen terrorists but also planned, financed, supplied, and "claimed responsibility" for the operation. Libya, plaintiffs alleged, trained the PLO instructors who trained the thirteen terrorists, planned, supplied, financed, and "claimed responsibility" for the operation, and gave an official "hero's welcome" to the ship that carried the terrorists to Israel. As for the PIO and

**2.** The district court dismissed the action against all defendants on the alternative ground that it was barred by the local one-year statute of limitations for certain torts. D.C.Code Ann. § 12–301(4) (1981). *Hanoch Tel-Oren v. Libyan Arab Republic,* 517 F.Supp. 542, 550–51 (D.D.C.1981). Because we agree that the complaint was properly dismissed on other grounds, we need not reach this ground. Nor need we reach the district court's dismissal of the action against the NAAA and PIO (as well as the PCNA) on the ground that the allega-

tions of the complaint were insufficiently specific. *See* note 4 *infra.*

**3.** In the district court, appellants also argued that jurisdiction rested on 28 U.S.C. § 1330 (1976) (Foreign Sovereign Immunities Act) and on 28 U.S.C. § 1332 (1976) (diversity). The district court rejected both grounds of jurisdiction, 517 F.Supp. at 549 n. 3, and appellants have abandoned them on appeal.

the NAAA, the complaint contains only the general allegations that the PIO is an agent and instrumentality of the PLO and that both the PIO and the NAAA helped plan, finance, outfit, and direct the terrorist operation.[4]

Though the complaint sought recovery under five theories of liability, only two need be considered to decide this appeal. Count II charges defendants with tortious actions in violation of the law of nations. Count III charges defendants with tortious actions in violation of various treaties of the United States.[5] The district court granted the NAAA's motion to dismiss for lack of jurisdiction. The portion of the district court's inquiry that is relevant here is whether the allegations of Counts II and III sufficed to support jurisdiction under sections 1331 or 1350.

Section 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Section 1350 provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." With respect to Count III's allegation of treaty violations, the district court found jurisdiction lacking on the ground that none of the treaties alleged to be violated either expressly or impliedly gave rise to a private right of action. 517 F.Supp. at 545–48. With respect to Count II's allegation that appellees violated the law of nations, the district court held that neither section 1331 nor section 1350 provided jurisdiction. Section 1331 jurisdiction is lacking, the court held, because federal common law, which incorporates the law of nations, cannot be constituted to grant a cause of action without "judicial interference with foreign and international relations." 517 F.Supp. at 548. Section 1350 jurisdiction is lacking, the district court held, for the same reason: International human rights law grants no private right of action, and section 1350, like section 1331, must be interpreted narrowly to require such a right in suits for violation of international law. 517 F.Supp. at 549–50.

In this appeal, appellants agree with the district court that, for purposes of the issues raised in this case, the jurisdictional requirements of sections 1331 and 1350 are the same. See Brief for Appellants at 35–36; 517 F.Supp. at 549 n. 2 ("[P]laintiffs themselves recognize that the jurisdictional bases of § 1331 and § 1350 are identical as to the role of the law of nations."). Contrary to the holding of the district court, however, they contend that at least some of the treaties they cite in their complaint impliedly provide private rights of action for the claims in Count III and that federal common law provides private rights of action for the claims in Count II. Thus, appellants argue, section 1350 gives jurisdiction over the claims of the alien plaintiffs and section 1331 gives jurisdiction over the claims of all the plaintiffs, including those who are United States citizens.[6]

---

**4.** The district court found the complaint's allegations against the PIO and the NAAA (and against the PCNA) insubstantial, vague, and devoid of any factual detail. It therefore held those allegations insufficient to support a tort action for damages. 517 F.Supp. at 549.

**5.** Count I charges defendants with the torts of assault, battery, false imprisonment, and intentional infliction of mental distress; it also charges defendants with a tort it describes as the intentional infliction of cruel, inhuman, and degrading treatment. Count IV charges defendants with tortious actions in violation of various criminal laws of the United States. Count V charges defendants with conspiracy to commit the torts specified in Counts I through IV.

The district court dismissed Count IV on the ground that none of the federal statutes relied on by plaintiffs, 18 U.S.C. §§ 371, 956–957, 960, 1651–1652, 1654, 1661 (1976), provides a private right of action for damages. 517 F.Supp. at 545. Appellants have not appealed this ruling. Counts I and V provide no independent basis for federal jurisdiction under the two statutes alleged to vest the district court with jurisdiction. 28 U.S.C. §§ 1331, 1350 (1976 & Supp. V 1981).

**6.** The Tel-Oren plaintiffs are citizens of the United States, and the Drory plaintiffs are citizens of the Netherlands. The other plaintiffs are citizens of Israel. All the plaintiffs reside in Israel.

For the reasons given below, appellants' contentions must be rejected. I first consider separation of powers principles that counsel courts, in a case like this, not to infer any cause of action not expressly granted. I then show that the treaties on which appellants rely create no private causes of action. Turning next to appellants' claim under general principles of international law, I conclude that federal common law does not automatically accord appellants a cause of action and that appellants have not been granted a cause of action by federal statute or by international law itself. Finally, in order to clarify what I believe we should and should not have decided, I discuss the recent decision of the Second Circuit in *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), a case having some similarities to this one.

## II.

The question in this case is whether appellants have a cause of action in courts of the United States for injuries they suffered in Israel. Judge Edwards contends, and the Second Circuit in *Filartiga* assumed, that Congress' grant of jurisdiction also created a cause of action. That seems to me fundamentally wrong and certain to produce pernicious results. For reasons I will develop, it is essential that there be an explicit grant of a cause of action before a private plaintiff be allowed to enforce principles of international law in a federal tribunal. It will be seen below, however, that no body of law expressly grants appellants a cause of action; the relevant inquiry, therefore, is whether a cause of action is to be inferred. That inquiry is guided by general principles that apply whenever a court of the United States is asked to act in a field in which its judgment would necessarily affect the foreign policy interests of the nation.

The Supreme Court explained in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), that to ask whether a particular plaintiff has a cause of action is to ask whether he "is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." *Id.* at 240 n. 18, 99 S.Ct. at 2274 n. 18. The Court said that the "question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Id.* at 241, 99 S.Ct. at 2275 (emphasis in original). In addressing the question, as the *Davis* opinion itself makes clear, the focus may be at least as much on the character of the issues presented for decision as on the character of the class of litigants seeking an adjudication; and the result of the inquiry might well be that certain claims cannot be litigated at all in certain forums.

This case presents a question not covered by the analyses described by the *Davis* Court for statutory and constitutional causes of action. An analysis of the appropriateness of providing appellants with a cause of action must take into account the concerns that are inherent in and peculiar to the field of international relations. My assessment of those concerns leads me to a conclusion different from that reached in *Davis,* for here there appear to be "special factors counselling hesitation in the absence of affirmative action by Congress." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 396, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619 (1971). The factors counselling hesitation are constitutional; they derive from principles of separation of powers.

The crucial element of the doctrine of separation of powers in this case is the principle that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments." *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). That principle has been translated into a limitation on judicial power in the international law area principally through the act of state and political question doctrines. Whether or not this case falls within one of these categories, the concerns that underlie

them are present and demand recognition here.

"The act of state doctrine in its traditional formulation precludes the courts from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). Originally, the doctrine rested primarily on notions of sovereignty and comity. *See Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). In more recent formulations, there has been "a shift in focus from the notions of sovereignty and the dignity of independent nations ... to concerns for preserving the 'basic relationships between branches of government in a system of separation of powers,' and not hindering the executive's conduct of foreign policy by judicial review or oversight of foreign acts." *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1292 (3d Cir.1979) (quoting *Sabbatino,* 376 U.S. at 423, 84 S.Ct. at 937).

The *Sabbatino* Court explained that, although the Constitution does not compel the act of state doctrine, the doctrine has " 'constitutional' underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations." 376 U.S. at 423, 84 S.Ct. at 937. The Court emphasized the separation of powers basis for the doctrine when it observed that the doctrine's "continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Id.* at 427–28, 84 S.Ct. at 939–40. In its principal post-*Sabbatino* act of state case, the Supreme Court again stressed the centrality of separation of powers concerns: "The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 697, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976).[7] The courts of appeals have likewise emphasized the decisive role played, in applying the doctrine, by the two relevant aspects of separation of powers: the potential for interference with the political branches' functions and the

7. The Supreme Court also discussed the act of state doctrine in *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), but the case produced no majority opinion. Nonetheless, all of the Justices except Justice Douglas, who scarcely addressed the act of state doctrine, stated that judicial abstention from pronouncing judgment on the validity of a foreign act of state turns on separation of powers concerns.

Four Justices said that application of the act of state doctrine depends chiefly on the potential for interference with, or usurpation of, the political branches' primary role in foreign affairs. Justice Rehnquist, joined by Chief Justice Burger and Justice White, stated: "The line of cases from this Court establishing the act of state doctrine justifies its existence primarily on the basis that juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government." 406 U.S. at 765, 92 S.Ct. at 1812 (Opinion of Rehnquist, J.). He also stated: "The act of state doctrine is grounded on judicial concern that application of customary principles of law to judge the acts

of a foreign sovereign might frustrate the conduct of foreign relations by the political branches of the government." *Id.* at 767–68, 92 S.Ct. at 1813. Justice Powell, writing separately, echoed these views. The act of state doctrine, he said, bars adjudication when and only when "it appears that an exercise of jurisdiction would interfere with delicate foreign relations conducted by the political branches." *Id.* at 775–76, 92 S.Ct. at 1813 (Powell, J., concurring in the judgment).

Justice Brennan, joined by Justices Stewart, Marshall, and Blackmun, disagreed with the view that the act of state doctrine was exclusively concerned with interference with other branches' conduct of foreign relations. Rather, he wrote, the act of state doctrine is one part of the political question doctrine and therefore depends for its application on a variety of considerations, no one of which—not even the Executive's declaration that adjudication will not interfere with foreign relations—can be conclusive on the ultimate determination whether an issue is fit for judicial resolution. 406 U.S. at 785–93, 92 S.Ct. at 1822–25 (Brennan, J., dissenting).

fitness of an issue for judicial resolution. *See, e.g., International Association of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1358–61 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d at 1292–93; *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 77–79 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 605–08 (9th Cir.1976).

The same separation of powers principles are reflected in the political question doctrine. The Supreme Court gave that doctrine its modern formulation in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962):

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied. *See id.* at 211–14, 82 S.Ct. at 706–08. If it were necessary, I might well hold that the political question doctrine bars this lawsuit, since it is arguable, as much of the remainder of this opinion will show, that this case fits several of the categories listed in *Baker v. Carr*. Such a determination is not necessary, however, because many of the same considerations that govern application of the political question doctrine also govern the question of the appropriateness of providing appellants with a cause of action.[8]

Neither is there a need to consider whether the act of state doctrine applies to bar this case from going forward. Although the act of state doctrine might well apply to Libya's alleged role in the 1978 bus attack, it would seem not to apply, in its current formulation, to the alleged acts of the PLO, the PIO, and the NAAA, none of which would seem to be a state under internation-

---

**8.** A plaintiff who has no cause of action is, according to *Davis v. Passman*, 442 U.S. at 240 n. 18, 99 S.Ct. at 2274 n. 18, not entitled to "invoke the power of the court." He is not entitled to a pronouncement on the legal merits of his claim. In that respect he is more like a plaintiff who lacks standing than he is like a plaintiff facing a motion to dismiss for failure to state a claim. That is especially true in a case like this, where judicial consideration of the legal merits is of constitutional concern, so that parties should not be able to waive the claim that no cause of action exists. In these circumstances, whether a cause of action exists is a threshold issue that involves a question of the limits of judicial powers.

I do not conceive that, in a case like this, the political question doctrine must be considered first because it is jurisdictional. The jurisdictional aspect of that doctrine extends no further than its rationale: to prevent courts from reaching the merits of issues that, for a variety of reasons, are not theirs to decide. *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710. By deciding that there is no private cause of action here we do not reach substantive issues that are best decided by the political branches. It may be, moreover, that while the existence of a cause of action is not a jurisdictional issue in the ordinary case, it is, or is closely akin, to a jurisdictional issue when its decision implicates, as here, considerations linked to the proper exercise of the judicial power granted by Article III of the Constitution. It is probably better not to invoke the political question doctrine in this case. That the contours of the doctrine are murky and unsettled is shown by the lack of consensus about its meaning among the members of the Supreme Court, *see Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), and among scholars, *see, e.g.*, Henkin, *Is There A "Political Question" Doctrine?*, 85 Yale L.J. 597, 622–23 (1976). Given this situation, I would rather not decide whether a political question is involved in a case where that issue has not been briefed and argued. By contrast, the grounds upon which I do decide were thoroughly explored through vigorous adversarial presentations.

al law. *See* Kassim, *The Palestine Liberation Organization's Claim to Status: A Juridical Analysis Under International Law,* 9 Den.J.Int'l L. & Pol'y 1, 2–3 (1980).[9] Nevertheless, to the extent the act of state doctrine is based predominantly, if not exclusively, on separation of powers concerns (as it has increasingly come to be), its own rationale might justify extending it to cover the acts of such entities as the PLO where adjudication of the validity of those acts would present problems of judicial competence and of judicial interference with foreign relations. Such an extension would bring the act of state doctrine closer, especially in its flexibility, to the political question doctrine. *Cf. First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 785–93, 92 S.Ct. 1808, 1822–25, 32 L.Ed.2d 466 (1972) (Brennan, J., dissenting) (act of state doctrine as elaborated in *Sabbatino* equivalent to political question doctrine). Whether the two doctrines should be merged and how, if merged, they would apply to the allegations of appellants' complaint are issues beyond the scope of our inquiry. Instead, those doctrines are drawn upon for what they say about the separation of powers principles that must inform a determination of the appropriateness of appellants' litigating their claims in federal court.

Those principles counsel against recognition of a cause of action for appellants if

adjudication of their claims would raise substantial problems of judicial interference with nonjudicial functions, such as the conduct of foreign relations. Appellants' complaint requires a determination, either at the jurisdictional stage or at the stage of defining and applying a rule of decision, whether international law has been violated.[10] I am therefore guided in large measure by the Supreme Court's observation in *Sabbatino* that

> the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.

376 U.S. at 428, 84 S.Ct. at 940. There is no need to decide here under what circumstances considerations such as these might deprive an individual of a cause of action clearly given by a state, by Congress, by a treaty, or by international law.[11] In the

9. "The state as a person of international law should possess the following qualifications: a) a permanent population; b) a defined territory; c) government; and d) capacity to enter into relations with the other states." Convention on Rights and Duties of States, Dec. 26, 1933, art. 1, 49 Stat. 3097, T.S. No. 881, 165 L.N.T.S. 19. *See also Restatement (Second) of the Foreign Relations Law of the United States* § 4 (1965). Furthermore, the act of state doctrine would still not apply, even if the PLO is said to have been the agent of Libya, since the attack did not take place "within [Libya's] own territory." *Sabbatino,* 376 U.S. at 401, 84 S.Ct. at 926.

10. If jurisdiction rested on section 1331, at least one necessary rule of decision would have to be supplied by international law, the federal law under which the case arose. *See Franchise Tax Board v. Construction Laborers Vacation Trust for Southern California,* —— U.S. ——,

103 S.Ct. 2841, 2846–48, 77 L.Ed.2d 420 (1983). If jurisdiction rested on section 1350, there are three arguable theories about what law would supply the rule of decision. The rule of decision might be the international law (treaty or customary international law) violated; it might be a federal common law of torts; or it might be the tort law of whatever jurisdiction applicable choice of law principles would point to. *Cf.* Blum & Steinhardt, *Federal Jurisdiction over International Human Rights Claims: The Alien Tort Claims Act after* Filartiga v. Pena-Irala, 22 Harv. Int'l L.J. 53, 99–100 (1981). Under the latter two constructions, of course, whether international law was violated would have to be decided as a jurisdictional prerequisite.

11. A state-court suit that involved a determination of international law would require consideration of much that I discuss here as well as the principle that foreign relations are constitu-

absence of such a cause of action, they lead to the conclusion that adjudication of appellants' claims would present grave separation of powers problems. It is therefore inappropriate to recognize a cause of action allowing appellants to bring this suit.[12]

Most important, perhaps, even appellants concede that the incidents described in appellants' complaint are properly understood only when viewed in the context of the continuing conflicts in the Middle East. Indeed, appellants point out that "[o]ne of the primary purposes of the March 11 attack was to sabotage the foreign relations of the United States and its negotiations by destroying the positive efforts made in the Camp David accords." Brief for Appellants at 15. The Camp David accords, of course, were but one of the major efforts made by the United States to resolve the myriad problems behind the series of military and political conflicts that have kept the Middle East at or near the center of American foreign relations for at least the last fifteen years. A judicial pronouncement on the PLO's responsibility for the 1978 bus attack would likely interfere with American diplomacy, which is as actively concerned with the Middle East today as it has ever been.[13]

The potential for interference with foreign relations is not diminished by the PLO's apparent lack of international law status as a state. Nor does it matter whether the Executive Branch officially recognizes, or has direct dealings with, the PLO. The fact remains that the PLO bears significantly upon the foreign relations of the United States. If any indication of that role is needed, it is provided by the official "observer" status that the PLO has been accorded at the United Nations, G.A.Res. 3237, 29 U.N.GAOR Supp. (No. 31) at 4, U.N.Doc. A/9631 (1974), as well as by the diplomatic relations that the PLO is reported to have with some one hundred countries around the world, see Kassim, supra, 9 Den. J.Int'l L. & Pol'y at 19; Friedlander, The PLO and the Rule of Law: A Reply to Dr. Anis Kassim, 10 Den.J.Int'l L. & Pol'y 221, 232 (1981).

The nature of appellants' international law claims provides a further reason for reluctance to recognize a cause of action for appellants. Adjudication of those claims would require the analysis of international legal principles that are anything but clearly defined and that are the subject of controversy touching "sharply on national nerves." Banco Nacional de Cuba v. Sabbatino, 376 U.S. at 428, 84 S.Ct. at 940. The Sabbatino Court warned against adjudication of such international law issues. Id. Because I believe that judicial pronouncements on the merits of this case should be avoided, I mention only briefly some of the difficulties raised by some of the claims in appellants' complaint.

Appellants would have to argue, if their case were adjudicated, for an exception to the general rule that international law im-

---

tionally relegated to the federal government and not the states. See Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

**12.** The existence of severe separation of powers problems in adjudicating appellants' claims reinforces my conclusion, see infra pp. 816–819, that international law affords appellants no cause of action. The potential for interference with governments conducting their foreign relations is central both to separation of powers limits on jurisdiction and to international law's general refusal to grant private rights of action. The existence of such a potential in any case must count strongly against international law's providing a private right of action for that case.

**13.** Libya must be dismissed from the case because the Foreign Sovereign Immunities Act,

28 U.S.C. §§ 1330, 1602–1611 (1976), plainly deprives us of jurisdiction over Libya. See Verlinden B.V. v. Central Bank of Nigeria, —— U.S. ——, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (court must decide immunity question, which is jurisdictional). Because the alleged actions of the PIO and the NAAA all involve giving assistance to the PLO's alleged actions, an adjudication of the claims against them would require adjudication of the claims against the PLO. If, as I conclude, the latter presents sufficiently serious problems that no cause of action can be inferred, so too must the former. I therefore concern myself only with the PLO. Of course, adjudication of the complaint against Libya would present many of the same separation of powers problems as would adjudication of the complaint against the other defendants.

poses duties only on states and on their agents or officials. *See* L. Henkin, R. Pugh, O. Schachter & H. Smit, *International Law,* 246–47 (1980); *Restatement of the Foreign Relations Law of the United States (Revised)* § 101, at 21 (Tent.Draft No. 1, 1980) (" 'International law' . . . deals with the conduct of states and of international organizations, and with their relations inter se, as well as some of their relations with persons, whether natural or juridical."); *id.* §§ 701–722, at 137–257 (Tent.Draft No. 3, 1982) (stating international law protections of persons solely in terms of state obligations). If, as would appear, the PLO is not a state, a finding that it should nonetheless be held to the duties imposed by the customary rules of international law governing the conduct of belligerent nations, *e.g.,* Geneva Convention for the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 3, 6 U.S.T. 3516, T.I.A.S. No. 3365, 75 U.N.T.S. 287; Protocols I and II of the Geneva Convention of 12 August 1949, June 7, 1977, Diplomatic Conference on Reaffirmation and Development of International Humanitarian Law Applicable to Armed Conflicts, *reprinted in* 16 I.L.M. 1391, 1443 (1977), would not entail merely the application of an agreed principle to new facts. Rather, a finding that because of its governmental aspirations and because of the role it has played in the Middle East conflicts the PLO should be subject to such rules would establish a new principle of international law. Likewise, to interpret various human rights documents as imposing legal duties on nonstates like the PLO would require both entering a new and unsettled area of international law and finding there an exception to international law's general rule.[14]

Another difficulty presented by appellants' complaint is that some of the documents on which they rely as statements of customary principles of international law

expressly make the purposes of an action relevant to its unlawfulness. For example, appellants allege that appellees violated the proscription, in article 51 of the Protocol I of the Geneva Conventions of 12 August 1949, on "[a]cts or threats of violence the primary purpose of which is to spread terror among the civilian population." They also allege that appellees violated the proscription on genocide, defined in the Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, to mean acts calculated to bring about the physical destruction, in whole or in part, of a national, ethnic, racial, or religious group. Adjudication of these claims would require inquiry into the PLO's intention in planning the 1978 bus attack (assuming the PLO's involvement) and into the organizational goals of the PLO. The dangers of such inquiry into the intentions of the PLO are similar to those attending an inquiry into the intentions of a state. *See Hunt v. Mobil Oil Corp.,* 550 F.2d at 77 (act of state doctrine bars inquiry into Libya's motivation for actions: "Inquiry could only be fissiparous, hindering or embarrassing the conduct of foreign relations which is the very reason underlying the policy of judicial abstention. . . .").

In addition, appellants' principal claim, that appellees violated customary principles of international law against terrorism, concerns an area of international law in which there is little or no consensus and in which the disagreements concern politically sensitive issues that are especially prominent in the foreign relations problems of the Middle East. Some aspects of terrorism have been the subject of several international conventions, such as those concerning hijacking, *e.g.,* Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation (Montreal Convention), Sept. 23, 1971, 24 U.S.T. 564, T.I.A.S. No. 7570; Con-

---

14. One aspect of this problem is the apparent assumption of state action in the definition of certain international legal principles. Thus, the United Nations General Assembly has defined torture as "any act by which severe pain or suffering is intentionally inflicted by or at the instigation of a public official." G.A.Res. 3452, art. 1, 30 U.N. GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1975). This assumption of state action is one reason why it is by no means utterly obvious that the torture alleged in appellants' complaint would be prohibited by international law.

vention on the Suppression of Unlawful Seizure of Aircraft (Hague Convention), Dec. 16, 1970, 22 U.S.T. 1641, T.I.A.S. No. 7192, 860 U.N.T.S. 105; Convention on Offenses and Certain Other Acts Committed on Board Aircraft (Tokyo Convention), Sept. 14, 1963, 20 U.S.T. 2941, T.I.A.S. No. 6768, 704 U.N.T.S. 219, and attacks on internationally protected persons such as diplomats, *e.g.,* Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents (New York Convention), Dec. 14, 1973, 28 U.S.T. 1975, T.I.A.S. No. 8532. But no consensus has developed on how properly to define "terrorism" generally. G. von Glahn, *Law Among Nations* 303 (4th ed. 1981). As a consequence, " '[i]nternational law and the rules of warfare as they now exist are inadequate to cope with this new mode of conflict.' " *Transnational Terrorism: Conventions and Commentary* xv (R. Lillich ed. 1982) (quoting Jenkins, International Terrorism: A New Mode of Conflict 16 (California Seminar on Arms Control and Foreign Policy, Research Paper No. 48, 1975)). "The dismal truth is that the international community has dealt with terrorism ambivalently and ineffectually." Shestack, *Of Private and State Terror— Some Preliminary Observations,* 13 Rutgers L.J. 453, 463 (1982).

Customary international law may well forbid states from aiding terrorist attacks on neighboring states. *See* Lillich & Paxman, *State Responsibility for Injuries to Aliens Occasioned by Terrorist Activities,* 26 Am.U.L.Rev. 217, 251–76 (1977). Although that principle might apply in a case like this to a state such as Libya (which is not a proper party here, *see supra* note 13), it does not, at least on its face, apply to a nonstate like the PLO. More important, there is less than universal consensus about whether PLO-sponsored attacks on Israel

are lawful. One important sign of the lack of consensus about terrorism generally, and about PLO activities in particular, is that accusations of terrorism are often met not by denial of the fact of responsibility but by a justification for the challenged actions. *See* Blum & Steinhardt, *supra* note 10, 22 Harv.Int'l L.J. at 92. Indeed, one of the key documents relied on as evidence of an international law proscription on terrorism, the Declaration on Principles of International Law Concerning Friendly Relations and Co-operation Among States in Accordance with the Charter of the United Nations, G.A.Res. 2625, 25 U.N.GAOR Supp. (No. 28) at 121, U.N.Doc. A/8028 (1970), was said by at least one state at the time of its promulgation not to be applicable to Palestinian terrorist raids into Israel supported by Arab states. 24 U.N.GAOR 297, U.N.Doc. A/C.6/SR. 1160 (1969) (remarks of Mr. El Attrash of Syria), discussed in Lillich & Paxman, *supra,* 26 Am.U.L.Rev. at 272 (qualification is significant). Attempts to secure greater consensus on terrorism have foundered on just such issues as the lawfulness of violent action by groups like the PLO fighting what some states view as "wars of national liberation." [15] *See* Franck & Lockwood, *Preliminary Thoughts Towards an International Convention on Terrorism,* 68 Am.J.Int'l L. 69 (1974); Paust, *"Nonprotected" Persons or Things,* in *Legal Aspects of International Terrorism* 341, 355–56 (A. Evans & J. Murphy eds. 1978); *cf.* Verwey, *The International Hostages Convention and National Liberation Movements,* 75 Am.J.Int'l L. 69 (1981) (obligations of national liberation movements were major problem in drafting and promulgating International Convention against the Taking of Hostages).

There is, of course, no occasion here to state what international law should be.

---

**15.** It is worth noting that even the 1972 United States Draft Convention for the Prevention and Punishment of Certain Acts of International Terrorism, 67 Dep't St.Bull. 431 (1972), would present some problems to appellants. First, it makes motive a key to violation. Second, like the European Convention on the Suppression of Terrorism, Jan. 27, 1977, 15 I.L.M. 1272

(1976), the 1972 Draft Convention relies on criminal remedies for the vindication of the rights specified, thus leaving the power to invoke remedies in the hands of states. Third, the 1972 Draft Convention does not protect citizens of a state against attack within the state.

Nor is there a need to consider whether an extended and discriminating analysis might plausibly maintain that customary international law prohibits the actions alleged in the complaint. It is enough to observe that there is sufficient controversy of a politically sensitive nature about the content of any relevant international legal principles that litigation of appellants' claims would present, in acute form, many of the problems that the separation of powers principles inherent in the act of state and political question doctrines caution courts to avoid. The lack of clarity in, and absence of consensus about, the legal principles invoked by appellants, together with the political context of the challenged actions and the PLO's impingement upon American foreign relations, lead to the conclusion that appellants' case is not the sort that is appropriate for federal-court adjudication, at least not without an express grant of a cause of action.

I turn next to examine treaties, common law, congressional enactments, and customary international law to determine whether any of these sources of law provides a cause of action for appellants. In light of what has been said, it would require a very clear showing that these other bodies of law grant appellants a cause of action before my concerns about the principles of separation of powers could be overcome. But, as will be seen, there is no clear grant of a cause of action to be found. In truth, the law concerning treaties and customary international law of its own force appears actually to deny appellants any cause of action.

### III.

Treaties of the United States, though the law of the land, do not generally create rights that are privately enforceable in courts. *Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829), *overruled on other grounds, United States v. Percheman,* 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1883); *Canadian Transport Co. v. United States,* 663 F.2d 1081, 1092 (D.C.Cir.1980); *Dreyfus v. Von Finck,* 534 F.2d 24, 29–30 (2d Cir.),

*cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). Absent authorizing legislation, an individual has access to courts for enforcement of a treaty's provisions only when the treaty is self-executing, that is, when it expressly or impliedly provides a private right of action. *Head Money Cases,* 112 U.S. 580, 598–99, 5 S.Ct. 247, 253–54, 28 L.Ed. 798 (1884); *Z & F Assets Realization Corp. v. Hull,* 114 F.2d 464, 470–71 (D.C.Cir. 1940), *aff'd on other grounds,* 311 U.S. 470, 489, 61 S.Ct. 351, 355, 85 L.Ed. 288 (1941); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d at 1298. When no right is explicitly stated, courts look to the treaty as a whole to determine whether it evidences an intent to provide a private right of action. *See Diggs v. Richardson,* 555 F.2d 848, 851 (D.C.Cir.1976).

In Count III of the complaint, appellants alleged that defendants violated the following "treaties of the United States":

—Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, T.I. A.S. No. 3365, 75 U.N.T.S. 287;

—Articles 1 and 2 of the Charter of the United Nations, June 26, 1945, 59 Stat. 1031, T.S. No. 993;

—Convention With Respect to the Laws and Customs of War on Land, July 29, 1899, 32 Stat. 1803, T.S. No. 403; Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539 (Hague Conventions);

—Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N. T.S. 135;

—Convention to Prevent and Punish the Acts of Terrorism Taking the Forms of Crime Against Persons and Related Extortion That Are of International Significance, Feb. 2, 1971, 27 U.S.T. 3949, T.I. A.S. No. 8413 (Organization of American States (OAS) Convention);

—Protocols I and II to the Geneva Conventions of 12 August 1949, June 7, 1977, Diplomatic Conference on Reaffirmation and Development of International Humanitarian Law Applicable in Armed

Conflict, *reprinted in* 16 I.L.M. 1391, 1442 (1977);

—Declaration on Principles of International Law Concerning Friendly Relations and Co-operation Among States in Accordance with the Charter of the United Nations, G.A.Res. 2625, 25 U.N.GAOR Supp. (No. 28) at 121, U.N.Doc. A/8028 (1970);

—Universal Declaration of Human Rights, G.A.Res. 217, U.N. 3 GAOR, U.N. Doc. 1/777 (1948);

—International Covenant on Civil and Political Rights, Annex to G.A.Res. 2200, 21 U.N.GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

—Basic Principles for the Protection of Civilian Populations in Armed Conflicts, G.A.Res. 2675, 25 U.N.GAOR Supp. (No. 28) at 76, U.N.Doc A/8028 (1970);

—Convention on the Prevention and Punishment of the Crime and Genocide, Dec. 9, 1948, 78 U.N.T.S. 277;

—Declaration of the Rights of the Child, G.A.Res. 1386, 14 U.N.GAOR Supp. (No. 16) at 19, U.N. Doc. A/4354 (1959); and

—American Convention on Human Rights, Nov. 22, 1969, O.A.S. Official Records OEA/Ser. K/XVI/1.1, Doc. 65, Rev. 1, Corr. 1, *reprinted in* 9 I.L.M. 101 (1970), 65 Am.J.Int'l L. 679 (1971).

Only the first five of these alleged treaties are treaties currently binding on the United States. *See* Treaties Affairs Staff, Office of the Legal Adviser, Department of State, *Treaties in Force* (1983). Even if the remaining eight are relevant to Count II of the complaint as evidence of principles of international law, they are not treaties of the United States. Since Count III (tortious actions in violation of the treaties of the United States) purports to state a cause of action distinct from that stated in Count II (tortious actions in violation of the law of nations), the last eight of the thirteen alleged treaties of the United States can provide no basis for jurisdiction over the claims

in Count III under the treaty components of sections 1331 and 1350.

Of the five treaties in force, none provides a private right of action. Three of them—the Geneva Convention for the Protection of Civilian Persons in Time of War, the Geneva Convention Relative to the Treatment of Prisoners of War, and the OAS Convention to Prevent and Punish Acts of Terrorism—expressly call for implementing legislation. A treaty that provides that party states will take measures through their own laws to enforce its proscriptions evidences its intent not to be self-executing. *See Foster v. Neilson,* 27 U.S. (2 Pet.) at 311–14, 7 L.Ed. 415; *United States v. Postal,* 589 F.2d 862, 876–77 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). These three treaties are therefore not self-executing. Indeed, with respect to the first Geneva Convention, one court has already so held. *Huynh Thi Anh v. Levi,* 586 F.2d 625, 629 (6th Cir.1978).

Articles 1 and 2 of the United Nations Charter are likewise not self-executing. They do not speak in terms of individual rights but impose obligations on nations and on the United Nations itself. They address states, calling on them to fulfill in good faith their obligations as members of the United Nations. Sanctions under article 41, the penultimate bulwark of the Charter, are to be taken by states against other states. Articles 1 and 2, moreover, contain general "purposes and principles," some of which state mere aspirations and none of which can sensibly be thought to have been intended to be judicially enforceable at the behest of individuals.[16] These considerations compel the conclusion that articles 1 and 2 of the U.N. Charter were not intended to give individuals the right to enforce them in municipal courts, particularly since appellants have provided no evidence of a contrary intent. *See Pauling v. McElroy,* 164 F.Supp. 390, 393 (D.D.C.1958), *aff'd,* 278 F.2d 252 (D.C.Cir.), *cert. denied,* 364 U.S.

---

**16.** For example, private enforcement of what is perhaps the fundamental principle of the Charter—the nonaggression principle of article 2, section 4—would flood courts throughout the world with the claims of victims of alleged aggression (claims that would be extremely common) and would seriously interfere with normal diplomacy.

835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960); *Dreyfus v. Von Finck,* 534 F.2d at 30; *People of Saipan v. Department of Interior,* 502 F.2d 90, 100–03 (9th Cir.1974) (Trask, J., concurring), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Sei. Fujii v. State,* 38 Cal.2d 718, 242 P.2d 617 (1952).

The Hague Conventions similarly cannot be construed to afford individuals the right to judicial enforcement. Although the Conventions contain no language calling for implementing legislation, they have never been regarded as law private parties could enforce. If they were so regarded, the code of behavior the Conventions set out could create perhaps hundreds of thousands or millions of lawsuits by the many individuals, including prisoners of war, who might think their rights under the Hague Conventions violated in the course of any large-scale war. Those lawsuits might be far beyond the capacity of any legal system to resolve at all, much less accurately and fairly; and the courts of a victorious nation might well be less hospitable to such suits against that nation or the members of its armed forces than the courts of a defeated nation might, perforce, have to be. Finally, the prospect of innumerable private suits at the end of a war might be an obstacle to the negotiation of peace and the resumption of normal relations between nations. It is for these reasons that the Conventions are best regarded as addressed to the interests and honor of belligerent nations, not as raising the threat of judicially awarded damages at war's end. The Hague Conventions are not self-executing. The Second Circuit has drawn the same conclusion, *Dreyfus v. Von Finck,* 534 F.2d at 30, and appellants have pointed to no case holding

otherwise in the more than three-quarters of a century since the Conventions were adopted.

None of the five treaties relied on by appellants thus even impliedly grants individuals the right to seek damages for violation of their provisions. Appellants have, therefore, failed to state a cause of action for violation of any treaties of the United States. Count III of their complaint, consequently, does not come within the arising-under jurisdiction of section 1331. Nor does it come within section 1350, because this provision, like section 1331, is merely a jurisdiction-granting statute and not the implementing legislation required by non-self-executing treaties to enable individuals to enforce their provisions. *See Dreyfus v. Von Finck,* 534 F.2d at 28 (affirming dismissal for lack of cause of action under treaties in suit by alien where jurisdiction expressly based on sections 1331 and 1350).[17]

## IV.

Appellants' argument that they may recover damages for violations of international law is simple. International law, they point out, is part of the common law of the United States. This proposition is unexceptionable. *See, e.g., The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *United States v. Smith,* 18 U.S. (5 Wheat.) 153, 5 L.Ed. 57 (1820). But appellants then contend that federal common law automatically provides a cause of action for international law violations, as it would for violations of other federal common law rights. I cannot accept this conclusion.[18]

---

17. Because none of the treaties cited by appellants provides them a cause of action, it is unnecessary to decide whether any of the treaties imposes duties on parties such as appellees here. Thus, in particular, there is no need to inquire into the contacts with the United States of appellees and their actions. That inquiry is also unnecessary for a decision on Count II of appellants' complaint, as I conclude that appellants have no cause of action for that count on grounds independent of the closeness of appellees' United States contacts.

18. The district court rejected it on the general ground that "an action predicated on ... norms of international law must have at its basis a specific right to a private claim" found in international law itself. 517 F.Supp. at 549. That formulation is very likely too strong, as it would seem to deny Congress the power to provide individuals a statutory right of action to seek damages for international law violations not actionable under international law itself.

Appellants' argument reflects a confusion of two distinct meanings of "common law". That term has long referred to the body of court-made law whose origins can be traced to the medieval English legal system. It has also come to refer generally to law (mostly court-made) not based on a statute or constitution. "Federal common law", in particular, has been used "to refer generally to federal rules of decision where the authority for a federal rule is not explicitly or clearly found in federal statutory or constitutional command." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 770 (2d ed. 1973) ("*Hart & Wechsler*"). To say that international law is part of federal common law is to say only that it is nonstatutory and nonconstitutional law to be applied, in appropriate cases, in municipal courts. It is not to say that, like the common law of contract and tort, for example, by itself it affords individuals the right to ask for judicial relief.

Thus, the step appellants would have us take—from the phrase "common law" to the implication of a cause of action—is not a simple and automatic one. Neither is it advisable. The considerations of separation of powers rehearsed above provide ample reason for refusing to take a step that would plunge federal courts into the foreign affairs of the United States.

Appellants, seeking to recover for a violation of international law, might look to federal statutes either for a grant of a cause of action or for evidence that a cause of action exists. These notions may be quickly dismissed. The only plausible candidates are the two jurisdictional statutes relied on by appellants, sections 1331 and 1350 of Title 28 of the United States Code. Neither of those statutes either expressly or impliedly grants a cause of action. Both statutes merely define a class of cases federal courts can hear; they do not themselves even by implication authorize individuals to bring such cases. As the Supreme Court has stated, "[t]he Judicial Code, in vesting jurisdiction in the District Courts, does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources which satisfy its limiting provisions." *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951). *See also Dreyfus v. Von Finck*, 534 F.2d at 28 (neither 1331 nor 1350 grants a cause of action).

Although the jurisdictional statutes relied on by appellants cannot be read to provide a cause of action, those statutes might conceivably provide evidence of Congress' recognition (as opposed to creation) of one. Appellants do not suggest that section 1331 is evidence of any such recognition, as nothing in its language or history could support such a reading. Rather, appellants focus on section 1350, which is concerned expressly and only with international law (treaties and customary international law) and therefore might suggest that Congress understood, when providing jurisdiction through section 1350, that some individuals would be able to take advantage of that jurisdiction because they had causes of action for torts committed in violation of the law of nations.[19]

The broadest reading of section 1350 as evidence of congressional recognition of such a cause of action is that it merely requires that a plaintiff prove that the actions complained of violated international law. If that jurisdictional prerequisite is met, according to appellants, the plaintiff has a cause of action for tort damages, as he would for any tort. This approach is adopted by the Second Circuit in *Filartiga*, as well as by Judge Edwards. I believe, nonetheless, that this construction of section 1350 must be rejected for several reasons.

19. Appellants argue that a citizen's access to federal courts to seek damages for a tort committed in violation of international law should be the same as an alien's access. International law's special concern for aliens might suggest to the contrary, see L. Henkin, R. Pugh, O. Schachter & H. Smit, *supra*, at 685–803, 805, and the restriction of section 1350 to aliens might reflect that concern. This question need not be pursued, however, since, for reasons having nothing to do with appellants' citizenship, they have no cause of action in this case.

First, appellants' broad reading would have to apply equally to actions brought to recover damages for torts committed in violation of treaties, since treaties stand in exactly the same position in section 1350 as principles of customary international law (the law of nations). Such an application would render meaningless, for alien plaintiffs, the well-established rule that treaties that provide no cause of action cannot be sued on without (express or implied) federal law authorization. *See supra* p. 784.

Judge Edwards' approach, as well as the analysis of the Second Circuit in *Filartiga*, would also make all United States treaties effectively self-executing. As appellants here seek evidence of a cause of action to vindicate an asserted international law right that they do not assert itself affords them a private right of action, their claim is indistinguishable, under the language of section 1350, from a claim brought to vindicate rights set forth in a non-self-executing treaty.

In addition, appellants' construction of section 1350 is too sweeping. It would authorize tort suits for the vindication of any international legal right. As demonstrated below, that result would be inconsistent with the severe limitations on individually initiated enforcement inherent in international law itself, and would run counter to constitutional limits on the role of federal courts. Those reasons demand rejection of appellants' construction of section 1350 unless a narrow reading of the provision is incompatible with congressional intent. There is no evidence, however, that Congress intended the result appellants suggest.

What is known of the origins of section 1350 was perhaps best described by Judge Friendly in *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975): "This old but little used section is a kind of legal Lohengrin; ... no one seems to know whence it came."

Section 1350 was enacted, in almost its current form, as part of the Judiciary Act of 1789, ch. 20, 1 Stat. 73, 77.[20] I have discovered no direct evidence of what Congress had in mind when enacting the provision. The debates over the Judiciary Act in the House—the Senate debates were not recorded—nowhere mention the provision, not even, so far as we are aware, indirectly. *See* 1 Annals of Cong. 782–833 (J. Gales ed. 1789).

Historical research has not as yet disclosed what section 1350 was intended to accomplish. The fact poses a special problem for courts. A statute whose original meaning is hidden from us and yet which, if its words are read incautiously with modern assumptions in mind, is capable of plunging our nation into foreign conflicts, ought to be approached by the judiciary with great circumspection. It will not do simply to assert that the statutory phrase, the "law of nations," whatever it may have meant in 1789, must be read today as incorporating all the modern rules of international law and giving aliens private causes of action for violations of those rules. It will not do because the result is contrary not only to what we know of the framers' general purposes in this area but contrary as well to the appropriate, indeed the constitutional, role of courts with respect to foreign affairs.

What little relevant historical background is now available to us indicates that those who drafted the Constitution and the Judiciary Act of 1789 wanted to open federal courts to aliens for the purpose of avoiding, not provoking, conflicts with other nations. *The Federalist* No. 80 (A. Hamilton). A broad reading of section 1350 runs directly contrary to that desire. It is also relevant to a construction of this provision that until quite recently nobody understood it to empower courts to entertain cases like this

**20.** Section 1350, the Alien Tort Claims Act, was enacted by the First Congress in section 9 of the Judiciary Act of September 24, 1789, ch. 20, 1 Stat. 73, 76–77. The original statute read: "[T]he district courts ... shall ... have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States."

one or like *Filartiga*.[21] As Justice Frankfurter said in *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 379, 79 S.Ct. 468, 483, 3 L.Ed.2d 368 (1959):

> The considerations of history and policy which investigation has illuminated are powerfully reinforced by the deeply felt and traditional reluctance of this Court to expand the jurisdiction of the federal courts through a broad reading of jurisdictional statutes. A reluctance which must be even more forcefully felt when the expansion is proposed, for the first time, eighty-three years after the jurisdiction has been conferred.

In the case of section 1350, the period before the expansion was proposed is more than twice eighty-three years.

Though it is not necessary to the decision of this case, it may be well to suggest what section 1350 may have been enacted to accomplish, if only to meet the charge that my interpretation is not plausible because it would drain the statute of meaning. The phrase "law of nations" has meant various things over time. It is important to remember that in 1789 there was no concept of international human rights; neither was there, under the traditional version of customary international law, any recognition of a right of private parties to recover. *See, e.g.,* Hassan, *International Human Rights and the Alien Tort Statute: Past and Future,* in *Human Rights Symposium: Further Commentary,* 5 Hous.J.Int'l L. 131, 139 (1982); Oliver, *A Brief Replication: The Big Picture and Mr. Schneebaum's Reply,* in *Human Rights Symposium: Further Commentary,* 5 Hous.J.Int'l L. 151, 153 (1982); 1 L. Oppenheim, *International Law* § 292 (2d ed. 1912), *quoted in* Hassan, *Panacea or Mirage? Domestic Enforcement of International Human Rights Law: Recent Cases,* 4 Hous.J.Int'l L. 13, 26–27 (1981). *See also* Hassan, *supra,* 4 Hous.J.

Int'l L. at 19–20. Clearly, cases like this and *Filartiga* were beyond the framers' contemplation. *Id.* at 24–26. That problem is not avoided by observing that the law of nations evolves. It is one thing for a case like *The Paquete Habana* to find that a rule has evolved so that the United States may not seize coastal fishing boats of a nation with which we are at war. It is another thing entirely, a difference in degree so enormous as to be a difference in kind, to find that a rule has evolved against torture by government so that our courts must sit in judgment of the conduct of foreign officials in their own countries with respect to their own citizens. The latter assertion raises prospects of judicial interference with foreign affairs that the former does not. A different question might be presented if section 1350 had been adopted by a modern Congress that made clear its desire that federal courts police the behavior of foreign individuals and governments. But section 1350 does not embody a legislative judgment that is either current or clear and the statute must be read with that in mind.

What kinds of alien tort actions, then, might the Congress of 1789 have meant to bring into federal courts? According to Blackstone, a writer certainly familiar to colonial lawyers, "the principal offences against the law of nations, animadverted on as such by the municipal laws of England, [were] of three kinds; 1. Violation of safe-conducts; 2. Infringement of the rights of embassadors; and 3. Piracy." 4 W. Blackstone, *Commentaries* 68, 72, *quoted in* 1 W.W. Crosskey, *Politics and Constitution in the History of the United States* 459 (1953) ("Crosskey"). One might suppose that these were the kinds of offenses for which Congress wished to provide tort jurisdiction

---

**21.** In nearly two hundred years, jurisdiction has been predicated successfully under section 1350 only three times. *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980) (jurisdiction over allegation of official torture not ratified by official's state); *Adra v. Clift,* 195 F.Supp. 857 (D.Md.1961) (child custody dispute between two aliens; wrongful withholding of custody is a tort, and defendant's falsification of child's passport to procure custody violated law of nations); *Bolchos v. Darrel,* 3 F.Cas. 810 (D.S. C.1795) (No. 1607) (suit for restitution of three slaves who were on board a Spanish ship seized as a prize of war; treaty with France superseded law of nations; 1350 alternative basis of jurisdiction).

for suits by aliens in order to avoid conflicts with other nations.[22]

The Constitution, of course, gave particular attention to piracy and to the rights of ambassadors. Article I, section 8, links piracy and the law of nations by granting Congress power "to define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." And Article III, section 2, gives the Supreme Court original jurisdiction over "all Cases affecting Ambassadors, other Public Ministers and Consuls." Section 9 of the Judiciary Act of 1789 (now section 1350) gave jurisdiction to district courts, concurrent with that of state courts and circuit courts, over tort suits by aliens for violations of the law of nations. Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 76–77. This may well have envisaged a tort like piracy (a citizen could use diversity jurisdiction).[23]

The idea that section 9 of the original Judiciary Act, now section 1350, was concerned with the rights of ambassadors (and other foreign representatives) is suggested by another provision of the statutes. Section 13 gave the Supreme Court such original and exclusive jurisdiction over all suits *against* ambassadors "as a court of law can have or exercise consistently with the law of nations" (emphasis added). Judiciary

**22.** That Blackstone refers to these three classes of offenses as not only violations of the law of nations, but censured as such by the municipal law of England does not require the conclusion that in America these three types of violations did not carry with them a private cause of action for which section 1350 gave the necessary jurisdiction to federal courts. The former colonies picked up the law of England as their own. As stated in the Preface to the American Edition of Blackstone: "The *common law* is as much the birth-right of an American as of an Englishman. It is our law, as well as the law of England, it having been brought thence, and established here as far forth as it was found fitted to our institutions and the circumstances of the country." W. Blackstone, *Commentaries* vii (1854) (emphasis in original). English statutes, which were, of course, part of the municipal law, were also adopted as part of American common law, to the extent that their "collective and equitable principles had become so interwoven with the common law, as to be scarcely distinguishable therefrom." *Fitch v. Brainerd,* 2 Conn. 163 (1805), *quoted in* Jones, *The Reception of the Common Law in the United States* in H. Jones, J. Kernochan, & A. Murphy, *Legal Method: Cases and Text Materials* (1980). And at least some offenses against the law of nations, such as violations of safe-conducts, resulted not only in criminal punishment but in restitution for the alien out of the offender's effects. W. Blackstone, *Commentaries* 69.

**23.** The crime of piracy was often defined as piracy *jure gentium*—piracy by the law of nations, as distinguished from piracy by municipal law. *E.g.,* 2 J. Moore, *A Digest of International Law* § 311, at 951–52 (1906); Dickinson, *Is the Crime of Piracy Obsolete?,* 38 Harv.L. Rev. 334, 335–36 (1925) ("*The Crime of Piracy*"). The crime of piracy was thought to be sufficiently defined by the law of nations. *The Federalist* No. 42 (J. Madison) ("The definition of piracies might, perhaps, without inconveni-

ency, be left to the law of nations; though a legislative definition of them is found in most municipal codes. A definition of felonies on the high seas, is evidently requisite."). Although the Congress, in defining piracy in the Federal Crimes Act of 1790 confused the concepts of piracy defined by the law of nations and piracy defined by municipal law, Act of Apr. 30, 1790, ch. 9, § 8, 1 Stat. 112, 113–14; *see The Crime of Piracy* at 342–49, Congress later changed the definition in reaction to the very first Supreme Court case construing section 8, *United States v. Palmer,* 16 U.S. (3 Wheat.) 610, 4 L.Ed. 471 (1818). The new statute punished "the crime of piracy, as defined by the law of nations." Act of Mar. 3, 1819, ch. 77, § 5, 3 Stat. 510, 513–14. *See The Crime of Piracy* at 342–49. Thus, Justice Story, in *United States v. Smith,* 18 U.S. (5 Wheat.) 71, 75, 5 L.Ed. 57 (1820), wrote that "whether we advert to writers on the common law, or the maritime law, or the law of nations, we shall find, that they universally treat of piracy as an offence against the law of nations, and that its true definition by that law is robbery upon the sea." Furthermore, in a celebrated footnote of more than eight and one-half pages, Justice Story showed that "piracy is defined by the law of nations." *Id.* at 75–84, 5 L.Ed. 57.

Opening federal courts to tort suits based on piracy would not, apparently, have involved courts in foreign relations since piracy was, as stated in *United States v. Smith,* merely robbery on the high seas. It could not be committed by nations, or by anyone acting for reasons other than for plunder. According to Hackworth, "when the acts in question are committed from purely political motive, it is hardly possible to regard them as acts of piracy involving all the important consequences which follow upon the commission of that crime." G. Hackworth, *Digest of International Law* § 203, at 681 (1941).

Act of 1789, ch. 20, § 13, 1 Stat. 73, 80–81. That section, however, gave the Court original but not exclusive jurisdiction of "all suits brought *by* ambassadors, or other public ministers, or in which a consul, or vice consul, shall be a party" (emphasis added). This appears to tie in to the grant of tort jurisdiction for suits by aliens in what is now section 1350. (Section 1350's use of the broader term "aliens" may merely indicate that the torts of piracy and violations of safe-conduct, which would involve plaintiffs other than ambassadors, were included.)

An intent to protect the rights of ambassadors is also plausible historically. According to Crosskey, the Convention, in assigning to Congress the power to "define and punish ... Offences against the Law of Nations" had in mind, aside from piracy, the rights of ambassadors. Crosskey at 459. He draws this conclusion from the notoriety of a case discussed by both Lord Mansfield, of the Court of King's Bench, and by Blackstone. An ambassador of the Czar had been arrested by his English creditors, and, was, in the process "somewhat roughed up before the arrest was accomplished." *Id.* He demanded of the Queen that his assailants be subjected to "severe 'corporal Punishment.'" *Id.* at 460. English law at the time, however, did not permit punishment severe enough to satisfy the offended ambassador, who protested to Czar Peter. The Czar demanded that the offenders be put to death. As a result, the law was changed, giving the Chief Justice of Queen's Bench, among other members of the "executive" branch, the power to try any offenses against ambassadors, and the Czar was placated. *Id.* at 461–62. This "slightly ridiculous affair," according to Crosskey, was well-known because of repeated comment upon it. *Id.* at 462. If this was indeed the incident the Convention considered in allocating to Congress the power to "define and punish ... Offences against the Law of Nations," it may be that the First Congress, sensitive to the international ramifications of denying ambassadors redress, enacted section 1350 to give ambassadors the option of bringing tort actions in federal courts as well as in state courts.

These thoughts as to the possible original intention underlying section 1350 are admittedly speculative, and those who enacted the law may well have had additional torts in mind. I offer these possibilities merely to show that the statute could have served a useful purpose even if the larger tasks assigned it by *Filartiga* and Judge Edwards are rejected. Moreover, if the offenses against the law of nations listed by Blackstone constituted the torts the framers of section 1350 had in mind, then the creation of federal jurisdiction for the redress of aliens' grievances would tend to ease rather than inflame relations with foreign nations. That result comports with Hamilton's expressed desire. Whether evidence so slim as to the intended office of the statute provides materials from which courts today may properly make substantive law is a jurisprudential issue with which, given the grounds upon which I would place our decision, I need not grapple today. But when courts go beyond the area in which there is any historical evidence, when they create the substantive rules for topics such as that taken up in *Filartiga* or in Judge Edwards' formulations, then law is made with no legislative guidance whatever. When that is so, it will not do to insist that the judge's duty is to construe the statute in order not to flout the will of Congress. On these topics, we have, at the moment, no evidence what the intention of Congress was. When courts lack such evidence, to "construe" is to legislate, to act in the dark, and hence to do many things that, it is virtually certain, Congress did not intend. Any correspondence between the will of Congress in 1789 and the decisions of the courts in 1984 can then be only accidental. Section 1350 can probably be adequately understood only in the context of the premises and assumptions of a legal culture that no longer exists. Perhaps historical research that is beyond the capacities of appellate judges will lift the darkness that now envelops this topic, but that has not yet occurred, and we should not attempt to anticipate what may or may not become visible.

Congress' understanding of the "law of nations" in 1789 is relevant to a consideration of whether Congress, by enacting section 1350, intended to open the federal courts to the vindication of the violation of any right recognized by international law. Examining the meaning of the "law of nations" at the time does not, contrary to my colleague's charges, "avoid the dictates of *The Paquete Habana*" and "limit the 'law of nations' to its 18th Century definition." Edwards' op. at 29. The substantive rules of international law may evolve and perhaps courts may apply those new rules, but that does not solve the problem of the existence of a cause of action. If plaintiffs were explicitly provided with a cause of action by the law of nations, as it is currently understood, this court might—subject to considerations of justiciability—be required by section 1350 to entertain their claims. But, as discussed below, *see infra* pp. 816–819, international law today does not provide plaintiffs with a cause of action.[24]

Recognition of suits presenting serious problems of interference with foreign relations would conflict with the primary purpose of the adoption of the law of nations by federal law—to promote America's peaceful relations with other nations. *See The Federalist* No. 80 (A. Hamilton); *The Federalist* No. 83 (A. Hamilton). Judge Edwards cites this rationale as a reason for reading section 1350 as creating a cause of action for private parties. The inference from that rationale seems to me, however, to run in precisely the opposite direction. Adjudication of international disputes of this sort in federal courts, disputes over international violence occurring abroad, would be far more likely to exacerbate tensions with other nations than to promote peaceful relations.

Under the possible meaning I have sketched, section 1350's current function would be quite modest, unless a modern statute, treaty, or executive agreement provided a private cause of action for violations of new international norms which do not themselves contemplate private enforcement. Then, at least, we would have a current political judgment about the role appropriate for courts in an area of considerable international sensitivity.

## V.

Whether current international law itself gives appellants a cause of action requires more extended discussion. Appellants' claim, in Count II of their complaint, is that appellees have committed the "torts of terror, torture, hostage-taking and genocide," Brief for Appellants at 29, in violation of various customary principles of international law. Such principles become law by virtue of the "general assent of civilized nations." *The Paquete Habana,* 175 U.S. at 694, 20 S.Ct. at 297. Unlike treaties and statutes, such law is not authoritatively pronounced by promulgation in a written document but must be found in the "customs and usages of civilized nations" as evidenced by the works of "jurists and commentators." *Id.* at 700, 20 S.Ct. at 299; *see* Statute of the International Court of Justice, art. 38, 59 Stat. 1055 (1945), T.S. No. 993; *Restatement of the Foreign Relations Law of the United States (Revised)* §§ 102–103, at 24–38 (Tent. Draft No. 1, 1980). Consequently, any cause of action that might exist, like the precise meaning of the customary principles themselves, must be inferred from the sources that are evidence of and attempt to formulate the legal rules. The district court found, and appellants have not argued to the contrary, that none of the documents appellants have put forth as stating the international legal principles on which they rely expressly state that individuals can bring suit in municipal courts to enforce the specified rights. *See* 517 F.Supp. at 548–49. Moreover, we have been pointed to nothing in their language,

---

**24.** Nor is there any significance to the fact that in *The Paquete Habana* the court assumed a private cause of action to exist. That case involved a branch of the law of nations—prize jurisdiction under maritime law—which had long recognized the right of private enforcement. That, as will be shown, is not universally true of international law and most particularly is not true of the area in which this case falls.

structure, or circumstances of promulgation that suggests that any of those documents should be read as implicitly declaring that an individual should be able to sue in municipal courts to enforce the specified rights. In any event, there is no need to review those documents and their origins in further detail, for, as a general rule, international law does not provide a private right of action, and an exception to that rule would have to be demonstrated by clear evidence that civilized nations had generally given their assent to the exception. Hassan, *supra,* 4 Hous.J.Int'l L. at 26–27.

International law typically does not authorize individuals to vindicate rights by bringing actions in either international or municipal tribunals. " 'Like a general treaty, the law of nations has been held not to be self-executing so as to vest a plaintiff with individual legal rights.' " *Dreyfus v. Von Finck,* 534 F.2d at 31 (quoting *Pauling v. McElroy,* 164 F.Supp. at 393). "[T]he usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. at 422–23, 84 S.Ct. at 937–38.

This general relegation of individuals to a derivative role in the vindication of their legal rights stems from "[t]he traditional view of international law ... that it establishes substantive principles for determining whether one country has wronged another." 376 U.S. at 422, 84 S.Ct. at 937. One scholar explained the primary role of states in international law as follows:

> Since the Law of Nations is based on the common consent of individual States, States are the principal subjects of International Law. This means that the Law of Nations is primarily a law for the international conduct of States, and not of their citizens. As a rule, the subjects of the rights and duties arising from the Law of Nations are States solely and exclusively.

1 L. Oppenheim, *International Law: A Treatise* 19 (H. Lauterpacht 8th ed. 1955). Even statements of individuals' rights or norms of individual conduct that have earned the universal assent of civilized nations do not become principles of international law unless they are "used by ... states for their common good and/or in dealings *inter se.*" *Lopes v. Reederei Richard Schroder,* 225 F.Supp. 292, 297 (E.D.Pa. 1963) (footnote omitted). *See Cohen v. Hartman,* 634 F.2d 318, 319 (5th Cir.1981) ("The standards by which nations regulate their dealings with one another *inter se* constitute the 'law of nations.' "); *IIT v. Vencap, Ltd.,* 519 F.2d at 1015 (ten commandments not international law for this reason).[25]

If it is in large part because "the Law of Nations is primarily a law between States," 1 L. Oppenheim, *supra,* at 636, that international law generally relies on an enforcement scheme in which individuals have no direct role, that reliance also reflects recognition of some other important characteristics of international law that distinguish it from municipal law. Chief among these is the limited role of law in the international realm. International law plays a much less pervasive role in the ordering of states' conduct within the international community than does municipal law in the ordering of individuals' conduct within nations. Unlike our nation, for example, the international community could not plausibly be described as governed by laws rather than men. "[I]nternational legal disputes are not as separable from politics as are domestic legal disputes...." *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. at 775, 92

---

**25.** Further evidence that "the Law of Nations is primarily a law between States" is the key role played by nationality in the availability to individuals of international legal protection. 1 L. Oppenheim, *supra,* at 640. Even nationals however, cannot themselves generally invoke that protection: "if individuals who possess nationality are wronged abroad, it is, as a rule, their home State only and exclusively which has a right to ask for redress, and these individuals themselves have no such right." *Id.* (footnote omitted).

S.Ct. at 1816 (Powell, J., concurring in the judgment).

International law, unlike municipal law (at least in the United States), is not widely regarded as a tool of first or frequent resort and as the last word in the legitimate resolution of conflicts. Nations rely chiefly on diplomacy and other political tools in their dealings with each other, and these means are frequently incompatible with declarations of legal rights. Diplomacy demands great flexibility and focuses primarily on the future rather than on the past, often requiring states to refrain, for the sake of their future relations, from pronouncing judgment on past conduct. *Cf. International Association of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1358 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). Since states adopt international law to improve their relations with each other, it is hardly surprising in the current world that they should generally retain for themselves control over the ability to invoke it. Nor is it surprising that international law is invoked less often to secure authoritative adjudications than it is to bolster negotiating positions or to acquire public support for foreign-relations policies. "By and large, nations have resisted third-party settlement of their disputes and adjudicative techniques have played a very limited role in their relations." Bilder, *Some Limitations of Adjudication as an International Dispute Settlement Technique,* 23 Va.J.Int'l L. 1, 1 (1982) (footnote omitted). One consequence is that international law has not been extensively developed through judicial decisions. *See* L. Henkin, R. Pugh, O. Schachter & H. Smit, *supra,* at 88 ("The strongly political character of many international issues accounts for the relative paucity of judicial decisions in contemporary international law.").

This remains true even as international law has become increasingly concerned with individual rights. Some of the rights specified in the documents relied upon by appellants as stating principles of international law recognizing individual rights are clearly not expected to be judicially enforced throughout the world. *E.g.,* Universal Declaration of Human Rights, G.A.Res. 217, 3 U.N.GAOR, U.N.Doc. 1/777 (1948) (right to life, liberty, and security of person; right to freedom from arbitrary detention; right to leave country; right to practice religion; right to speak and assemble; right to freely elected government); International Covenant on Civil and Political Rights, Annex to G.A.Res. 2200, 21 U.N.GAOR Supp. (No. 16) at 52, U.N.Doc. A/6316 (1966) (similar list of rights); American Convention on Human Rights, Nov. 22, 1969, O.A.S. Official Records OEA/Ser. K/XVI/1.1, Doc. 65, Rev. 1, Corr. 1, *reprinted in* 9 I.L.M. 101 (1970), 65 Am.J.Int'l L. 679 (1971) (similar list of rights). Some of the key documents are meant to be statements of ideals and aspirations only; they are, in short, merely precatory. *See* 1 L. Oppenheim, *supra,* at 745; 19 Dep't St.Bull, 751 (1948) (Universal Declaration on Human Rights "is not a treaty; it is not an international agreement. It is not and does not purport to be a statement of law or of legal obligation.") (remarks of U.S. representative to U.N. General Assembly) (quoted in L. Henkin, R. Pugh, O. Schachter & H. Smit, *supra,* at 808). Some define rights at so high a level of generality or in terms so dependent for their meaning on particular social, economic, and political circumstances that they cannot be construed and applied by courts acting in a traditional adjudicatory manner. *E.g.,* Universal Declaration of Human Rights, *supra* (rights to work, to just compensation, to leisure, to adequate standard of living, to education, to participation in cultural life); Declaration of the Rights of the Child, G.A.Res. 1386, 14 U.N.GAOR Supp. (No. 16) at 19, U.N.Doc. A/4354 (1959) (rights to opportunity to develop in normal manner, to grow up in atmosphere of affection and of moral and material security, to develop abilities, judgment and sense of moral and social responsibility, and to play). Some expressly oblige states to enact implementing legislation, thus impliedly denying a private cause of action. *E.g.,* International Covenant on Civil and

Political Rights, art. 2, *supra;*[26] American Convention on Human Rights, art. 2, *supra.*

It may be doubted that courts should understand documents of this sort as having been assented to as law by all civilized nations since enforcement of the principles enunciated would revolutionize most societies. For that reason, among others, courts should hesitate long before finding violations of a "law of nations" evidenced primarily by the resolutions and declarations of multinational bodies. *See* Note, *Custom and General Principles as Sources of International Law in American Federal Courts,* 82 Colum.L.Rev. 751, 772–74, 780–83 (1982). In any event, many of the rights they declare clearly were not intended for judicial enforcement at the behest of individuals. The express provision in the European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, art. 25, 213 U.N.T.S. 221, E.T.S. 5, of an international tribunal to which individuals may bring claims, thus evidencing states' ability to provide private rights of action when they wish to do so, is an extraordinary exception that highlights the general absence of individual-complaint procedures. Even that exception, moreover, is a far cry from the authorization of ordinary municipal-court enforcement. Current international human rights law, in whatever sense it may be called "law," is doubtless growing. But it remains true that even that branch of international law does not today generally provide a private right of action.

Appellants, therefore, are not granted a private right of action to bring this lawsuit either by a specific international legal right or impliedly by the whole or parts of international law.

## VI.

In *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), the Second Circuit, which did not address the issue of the existence of a cause of action, held that section 1350 afforded jurisdiction over a claim brought by Paraguayan citizens against a former Paraguayan official. The plaintiffs, a father and daughter, alleged that the defendant had tortured his son, her brother, in violation of international law's proscription of official torture. To highlight what I believe should be the basis for our holding, it is worth pointing out several significant differences between this case and *Filartiga.*

First, unlike the defendants in this case, the defendant in *Filartiga* was a state official acting in his official capacity. Second, the actions of the defendant in *Filartiga* were in violation of the constitution and laws of his state and were "wholly unratified by that nation's government." 630 F.2d at 889. Third, the international law rule invoked in *Filartiga* was the proscription of official torture, a principle that is embodied in numerous international conventions and declarations, that is "clear and

---

**26.** The International Covenant on Civil and Political Rights directs states to provide a forum for private vindication of rights under the Covenant. That provision, however, should not be taken to suggest the Covenant grants or recognizes a private right of action in municipal courts in a case like this. First, the Covenant directs states to provide forums only for the vindication of rights against themselves, not for the vindication of rights against other states. It is only the latter that raises all the political, foreign relations problems that lie behind international law's general rule against private causes of action; thus, even if the Covenant suggests recognition of a private cause of action for the former, it does not do so for the latter. Second, the Covenant does not itself say individuals can sue; rather, it leaves to states the fulfillment of an obligation to create private rights of action.

It is worth noting that the Human Rights Committee established by article 41 of the Covenant provides for complaints about a state's conduct to be brought only by another state and then only if the "defendant" state consents to the Committee's jurisdiction. An Optional Protocol, Annex to G.A.Res. 2200, 21 U.N. GAOR Supp. (No. 16) at 59, U.N. Doc. A/6316 (1966), provides for individuals' complaints. As of 1980, it had been signed by thirty states; the United States is not among them. *See* L. Henkin, R. Pugh, O. Schachter & H. Smit, *Basic Documents Supplement to International Law* 336 (1980). *See generally* Sohn, *The New International Law: Protection of the Rights of Individuals Rather than States,* 32 Am.U.L.Rev. 1, 21–23 (1982).

unambiguous" in its application to the facts in *Filartiga, id.* at 884, and about which there is universal agreement "in the modern usage and practice of nations." *Id.* at 883.

Thus, in *Filartiga* the defendant was clearly the subject of international-law duties, the challenged actions were not attributed to a participant in American foreign relations, and the relevant international law principle was one whose definition was neither disputed nor politically sensitive. None of that can be said about this case. For these reasons, not all of the analysis employed here would apply to deny a cause of action to the plaintiffs in *Filartiga.*

I differ with the *Filartiga* decision, however, because the court there did not address the question whether international law created a cause of action that the private parties before it could enforce in municipal courts. For the reasons given, that inquiry is essential.

### VII.

The opinions in this case are already too long and complex for me to think it appropriate to respond in detail to Judge Edwards' and Judge Robb's arguments. A few points ought to be made, however, with respect to each of the other concurring opinions.

### A.

First, Judge Edwards attributes to me a number of positions that I do not hold. *See* Edwards' op. at 777. For example, far from rejecting the four propositions he extracts from *Filartiga,* I accept the first three entirely and also agree with the fourth, but in a more limited form—namely, "section 1350 opens the federal courts for adjudication of rights already recognized by international law" but only when among those rights is that of individuals to enforce substantive rules in municipal courts.

Second, as noted earlier in this opinion, section 1350 provides jurisdiction for tort actions alleging violations of the "law of nations" and "treaties of the United States." No process of construction can pry apart those sources of substantive law; in section 1350, they stand in parity. If, as Judge Edwards states and *Filartiga* assumes, section 1350 not only confers jurisdiction but creates a private cause of action for any violation of the "law of nations," then it also creates a private cause of action for any violation of "treaties of the United States." This means that all existing treaties became, and all future treaties will become, in effect, self-executing when ratified. This conclusion stands in flat opposition to almost two hundred years of our jurisprudence, and it is simply too late to discover such a revolutionary effect in this little-noticed statute. This consideration alone seems to me an insuperable obstacle to the reading Judge Edwards and *Filartiga* give to section 1350.

Third, the implications of Judge Edwards' theory—that section 1350 itself provides the requisite cause of action—cause him so much difficulty that he is forced to invent limiting principles. Thus, the law enunciated in *Filartiga* is said to cover only those acts recognized as "international crimes," a category which he supposes not to be as broad as the prohibitions of the law of nations. This restriction may allay some, though by no means all, apprehensions about what courts may get themselves and the United States into, but it comes out of nothing in the language of section 1350. According to that statute, jurisdiction exists as to any tort in violation of the law of nations.

The "alternative formulation" my colleague espouses requires even more legislation to tame its unruly nature. Recognizing that this "alternative formulation" would open American courts to disputes "wholly involving foreign states," the concurrence erects a set of limiting principles. Three kinds of suits only are to be allowed: (1) by aliens for domestic torts committed on United States territory and that injure "substantial rights" under international law; (2) by aliens for "universal crimes" (no matter where committed); and (3) by aliens

against Americans for torts committed abroad, "where redress in American courts might preclude international repercussions." Edwards' op. at 788. Aside from the unguided policy judgments which these definitions require, and whatever else may be said of them, it is clear that these limitations are in no way prescribed, or even suggested, by the language of section 1350. Rather, they are imposed upon that language for reasons indistinguishable from ordinary legislative prudence. The necessity for these judicially invented limitations merely highlights the error in the reading given section 1350.

Finally, in assessing a statute such as this—one whose genesis and purpose are, to say the least, in considerable doubt—some perspective is required. For a young, weak nation, one anxious to avoid foreign entanglements and embroilment in Europe's disputes, to undertake casually and without debate to regulate the conduct of other nations and individuals abroad, conduct without an effect upon the interests of the United States, would be a piece of breathtaking folly—so breathtaking as to render incredible any reading of the statute that produces such results.

It is anomalous to suggest that such a reading is supported by Alexander Hamilton's concern, expressed in *The Federalist* No. 80, that aliens' grievances be redressable in federal courts. Hamilton was defending judicial authority which extended "to all those [cases] which involve the PEACE of the CONFEDERACY, whether they relate to the intercourse between the United States and foreign nations, or to that between the States themselves." *The Federalist* No. 80 (A. Hamilton). His concerns were very largely met by federal diversity jurisdiction, and, it would seem, would be entirely met by a section 1350 which had the historical meaning I have suggested above as plausible.

If section 1350 had been designed to provide aliens with redress in order to place in federal courts all those disputes about treaties and international law that might provoke international incidents, the jurisdiction given would not have been limited to torts only. The concurrence's response to this observation is to surmise a "compromise" for which there is absolutely no historical evidence.

But the trouble goes deeper than this. Judge Edwards' reading of the statute gives federal jurisdiction to suits between aliens for violations of international law and treaties of the United States. He suggests that this is proper because "[a] denial of justice might create the perception that the United States is siding with one party, thereby affronting the state of the other." Edwards' op. at 784 n. 13. This turns Hamilton's argument on its head. A refusal by a United States court to hear a dispute between aliens is much less offensive to the states involved than would be an acceptance of jurisdiction and a decision on the merits. In the latter case, the state of the losing party would certainly be affronted, particularly where the United States' interests are not involved. The United States would be perceived, and justly so, not as a nation magnanimously refereeing international disputes but as an officious interloper and an international busybody.

Indeed, it seems to me that Judge Edwards' interpretation would require us to hear this case, thus thrusting the United States into this improper and undesirable role. It can be argued that appellants here have alleged "official" torture: the complaint alleges that the PLO, in carrying out its attack, which the complaint alleges to have included torture, was acting at the behest of and in conjunction with Libya. Viewed this way, this case is indistinguishable from *Filartiga*, and as such, Judge Edwards' approach would force us to hear it. In entertaining such a suit, one of the issues would be whether the relationship between the PLO and Libya constituted that of agent and principal, so that Libya should be held responsible for the PLO's actions. The prospect of a federal court ordering discovery on such an issue, to say nothing of actually deciding it, is, or ought to be, little short of terrifying. If anything is likely to

disturb the "PEACE of the CONFEDERA-CY," this is.

If more needs to be said against the construction my colleague and the *Filartiga* court would give section 1350, it may be observed that their interpretation runs against the grain of the Constitution. It does so by confiding important aspects of foreign relations to the Article III judiciary despite the fact that the Constitution, in Article II and Article I, places that responsibility in the President and Congress. That is the fundamental reason I have argued that it is improper for judges to infer a private cause of action not explicitly granted.

### B.

Judge Robb misapprehends my position, equating it, in many respects, with Judge Edwards'. I have not read section 1350 as authorizing the courts to enter into sensitive areas of foreign policy: quite the contrary. As I have suggested, the statute probably was intended to cover only a very limited set of tort actions by aliens, none of which is capable of adversely affecting foreign policy. Since international law does not, nor is it likely to, recognize the capacity of private plaintiffs to litigate its rules in municipal courts, as a practical matter only an act of Congress or a treaty negotiated by the President and ratified by the Senate could create a cause of action that would direct courts to entertain cases like this one. Should such an improbable statute or treaty come into existence, it will be time to ask whether the constitutional core of the political question doctrine precludes jurisdiction. That inquiry would necessarily be constitutional in scope, for the prudential aspect of

the doctrine would be insufficient to deny jurisdiction if Congress had tried to do what *Filartiga* supposes. Judge Robb apparently thinks that the constitutional core applies, since he invokes the political question doctrine without even inquiring whether the statute applies to a case like this.

Judge Robb chides me for stating that the PLO "bears significantly upon the foreign relations of the United States." He states that I thereby give that organization "more in the way of official recognition than [it] has ever before gained from any institution of the national government." As it happens, that is not correct. Numerous officials of the United States have discussed the problems posed by the PLO for American foreign policy, including the President and the Secretary of State.[27] Judicial circumspection is certainly an admirable quality, but a court need not be so demure that it cannot even mention what the world knows and the highest officials of our government publicly discuss. It is, moreover, particularly startling to see the case for such extraordinary prudence made in an opinion that itself contains clear implications of responsibility for worldwide terrorism. It is surely self-defeating to engage in such speculations in order to avoid making the milder observation that the PLO affects our foreign relations.

Were the matter mine to decide, I would probably agree that the constitutional core of the political question doctrine bars this or any similar action. But I am bound by Supreme Court precedent and that precedent, in general and as it bears in particular upon the constitutional component of the doctrine, is most unclear. For that reason,

27. See, e.g., Meeting with Hispanic, Labor, and Religious Press, 19 Weekly Comp.Pres.Doc. 1245, 1248–49 (Sept. 14, 1983) (President Reagan's response to question: "[O]ne of the reasons why we would never negotiate with the PLO, [is] because they openly said they denied the right of Israel to be a nation."); Foreign and Domestic Issues, Question-and-Answer Session with Reporters, 19 Weekly Comp.Pres. Doc. 643, 647–48 (May 4, 1983) (President Reagan's response to question: "[A]re they going to stand still for their interests being neglected on the basis of an action taken by this

group, the PLO, which, as I say, was never elected by the Palestinian people?"); N.Y. Times, Nov. 10, 1983, at A12, col. 5 (remarks of Under Secretary of State for Political Affairs Lawrence S. Eagleburger). And, most recently, the New York Times reported on its front page Secretary of State George P. Shultz's comments that "the outcome of the struggle within the Palestine Liberation Organization was certain to have 'major implications' for the future of the American-sponsored peace efforts in the Middle East." N.Y. Times, Nov. 20, 1983, at A1, col. 5.

and others I have specified, see *supra* pp. 803 & note 8, it seems better to rest the case upon the grounds I have chosen. The result is the same. I would have said that this course has the additional virtue of giving guidance to the bar, but, as matters have turned out, the three opinions we have produced can only add to the confusion surrounding this subject. The meaning and application of section 1350 will have to await clarification elsewhere. Since section 1350 appears to be generating an increasing amount of litigation, it is to be hoped that clarification will not be long delayed. In the meantime, it is impossible to say even what the law of this circuit is. Though we agree on nothing else, I am sure my colleagues join me in finding that regrettable.

ROBB, Senior Circuit Judge:

I concur in the result, but must withhold approval of the reasoning of my colleagues. Both have written well-researched and scholarly opinions that stand as testaments to the difficulty which this case presents. Both agree that this case must be dismissed though their reasons vary greatly. Both look backward to *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir.1980), and forward to the future efforts of others maimed or murdered at the hands of thugs clothed with power who are unfortunately present in great numbers in the international order. But both Judges Bork and Edwards fail to reflect on the inherent inability of federal courts to deal with cases such as this one. It seems to me that the political question doctrine controls. This case is nonjusticiable.

A. *This case involves standards that defy judicial application.*

Tort law requires both agreement on the action which constitutes the tort and the means by which it can be determined who bears responsibility for the unlawful injury. Federal courts are not in a position to determine the international status of terrorist acts. Judge Edwards, for example, notes that "the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus." Edwards Opinion at 795. This nation has no difficulty with the question in the context of this case, of course, nor do I doubt for a moment that the attack on the Haifa highway amounts to barbarity in naked and unforgivable form. No diplomatic posturing as represented in sheaves of United Nations documents—no matter how high the pile might reach—could convince me otherwise. But international "law", or the absence thereof, renders even the search for the least common denominators of civilized conduct in this area an impossible-to-accomplish judicial task. Courts ought not to engage in it when that search takes us towards a consideration of terrorism's place in the international order. Indeed, when such a review forces us to dignify by judicial notice the most outrageous of the diplomatic charades that attempt to dignify the violence of terrorist atrocities, we corrupt our own understanding of evil.

Even more problematic would be the single court's search for individual responsibility for any given terrorist outrage. International terrorism consists of a web that the courts are not positioned to unweave. To attempt to discover the reach of its network and the origins of its design may result in unintended disclosures imperiling sensitive diplomacy. This case attempts to focus on the so-called P.L.O. But which P.L.O.? Arafat's, Habash's, or Syria's? And can we conceive of a successful attempt to sort out ultimate responsibility for these crimes? Many believe that most roads run East in this area.[1] Are courts prepared to travel

---

1. *See, e.g. Implementation of the Helsinki Accords, Hearing Before the Commission on Security and Cooperation in Europe, The Assassination Attempt on Pope John Paul II,* 97th Cong., 2d Sess. 20 (Statement of Michael A. Ledeen) ("[M]any terrorist organizations get support from the Soviet Union and its many surrogates around the world. I do not think there should be much doubt about the matter. The Russians train PLO terrorists in the Soviet Union, supervise the training of terrorists from all over the world in Czechoslovakia—or at

these highways? Are they equipped to do so? It is one thing for a student note-writer to urge that courts accept the challenges involved.[2] It is an entirely different matter for a court to be asked to conduct such a hearing successfully. The dangers are obvious. To grant the initial access in the face of an overwhelming probability of frustration of the trial process as we know it is an unwise step. As courts could never compel the allegedly responsible parties to attend proceedings much less to engage in a meaningful judicial process, they ought to avoid such imbroglios from the beginning.

B. *This case involves questions that touch on sensitive matters of diplomacy that uniquely demand a singlevoiced statement of policy by the Government.*

Judge Bork's opinion finds it necessary to treat the international status of the P.L.O., and to suggest that that organization "bears significantly on the foreign relations of the United States." Bork Opinion at 805. This is considerably more in the way of official recognition than this organiza-

tion has ever before gained from any institution of the national government. I am not in a position to comment with authority on any of these matters. There has been no executive recognition of this group, and for all our purposes it ought to remain an organization "of whose existence we know nothing . . ." *United States v. Klintock,* 18 U.S. 144, 149 (5 Wheat.) 5 L.Ed. 55 (1820). As John Jay noted: "It seldom happens in the negotiations of treaties, of whatever nature, but that perfect *secrecy* and immediate *dispatch* are sometimes requisite." *The Federalist,* # 64, Jay (Paul L. Ford, ed.). What was then true about treaties remains true for all manner of modern diplomatic contacts. It may be necessary for our government to deal on occasion with terrorists. It is not, however, for courts to wonder aloud as to whether these negotiations have, are, or will be taking place. Western governments have displayed a near uniform reluctance to engage in much discussion on the organization and operation of terrorist groups, much less on any hidden contacts with them.[3] When a genre

least they did until recently, according to a leading defector, General Jan Sejna—and work hand in glove with countries like Libya, Cuba, and South Yemen in the training of terrorists.") *See also* Adams, *Lessons and Links of Anti-Turk Terrorism,* Wall St.J., Aug. 16, 1983, at 32, col. 6 (The Armenian Secret Army for the Liberation of Armenia "remains a prime suspect for the charge of KGB manipulation of international terror. But in this area, one researcher in the field advises, 'You will never find the smoking gun'."); Barron, *KGB* 151, 255–257 (1974); Barron, *KGB Today: The Hidden Hand,* 21–22, 255–256 (1983).

2. Note, *Terrorism as a Tort in Violation of the Law of Nations,* 6 Fordham Int'l L.J. (1982).

3. C. Sterling, *The Terror Network* (1981). Sterling repeatedly points out, and often criticizes, the reluctance of Western governments to openly detail the international cooperation that girds most terrorist activities. She writes:

No single motive could explain the iron restraint shown by Italy, West German, and all other threatened Western governments in the face of inexorably accumulating evidence. . . . Both, and all their democratic allies, also had compelling reasons of state to avoid a showdown with the Soviet Union. . . . All were certainly appalled at the thought of tangling with Arab rulers. . . .

[P]olitical considerations were almost certainly paramount for government leaders under seige who . . . wouldn't talk.
*Id.* at 291, 294. Whatever the merits of Sterling's criticisms of this near uniform silence, the fact remains that our government, like those of its closest allies, is extremely wary of publicity in this area. Commenting on the refusal of Western governments to openly discuss the possibility of Soviet complicity in the attempt to assassinate Pope John Paul II, Congressman Ritter, a member of the bipartisan commission drawn from both the executive and legislative branches which is charged with monitoring compliance with the Helsinki Accords, commented that "[t]he involved governments have stayed away from this hot potato for a variety of reasons." *Implementation of the Helsinki Accords, Hearing Before the Commission on Security and Cooperation in Europe, The Assassination Attempt on Pope John Paul II, supra,* at 16. Both Sterling's book and the hearings in which Congressman Ritter participated are indispensable background reading for a court confronted with a question such as the one before us. These and other texts bring home the hopelessness of any attempt by an American court to trace a reliable path of responsibility for almost every terrorist outrage. These labyrinths of international intrigue will admit no judicial Theseus.

of cases threatens to lead courts repeatedly into the area of such speculations, then that is a signal to the courts that they have taken a wrong turn. The President may be compelled by urgent matters to deal with the most undesirable of men. The courts must be careful to preserve his flexibility and must hesitate to publicize and perhaps legitimize that which ought to remain hidden and those who deserve the brand of absolute illegitimacy. By jumping the political question threshold here, my colleagues appear to be leading us in just the opposite direction.

## C. Questions connected to the activities of terrorists have historically been within the exclusive domain of the executive and legislative branches.

The conduct of foreign affairs has never been accepted as a general area of judicial competence. Particular exceptions have, of course, arisen. When the question is precisely defined, when the facts are appropriately clear, the judiciary has not hesitated to decide cases connected with American foreign policy.[4]

But cases which would demand close scrutiny of terrorist acts are far beyond these limited exceptions to the traditional judicial reticence displayed in the face of foreign affairs cases. That traditional deference to the other branches has stemmed, in large part, from a fear of undue interference in the affairs of state, not only of this nation but of all nations. Judge Mulligan, writing in *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir.), *cert. denied* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), warned that a "Serbian Bog" awaits courts that inquire into the policies of foreign sovereigns. *Id.* at 77. A model of judicial deference, appropriately invoked, is *Diggs v. Richardson*, 555 F.2d 848 (D.C.Cir.1976). In that case this court was asked to enforce a United Nations Security Council Resolution. This court ruled in effect that the matter was nonjusticiable, and a part of the reasoning supporting that conclusion was that the Resolution did not provide specific standards suitable to

"conventional adjudication". *Id.* at 851. The court added that the standards that were supplied were "foreign to the general experience and function of American courts". *Id.* In refusing to allow the case to be jimmied into our judicial process, the court was fully aware that its deference did not abdicate all American participation in the issues raised by the Resolution. Our nation's involvement in the diplomatic arena was in no way circumscribed by judicial circumspection.

Similarly, the issues raised by this case are treated regularly by the other branches of the national government. One need only review the work of the Subcommittee on Security and Terrorism of the Senate Committee on the Judiciary to recognize that the whole dangerous dilemma of terrorism and the United States response to it are subjects of repeated and thorough inquiry. *See, e.g., Historical Antecedents of Soviet Terrorism Before the Subcomm. on Security and Terrorism of the Senate Comm. on Judiciary*, 97th Cong., 1st Sess. 1 (1981). *See also, Extradition Reform Act of 1981: Hearings on H.R. 5227 Before the Subcomm. on Crime of the House Comm. on the Judiciary*, 97th Cong., 2d Sess. 1 (1982). The executive branch is also deeply involved in the monitoring and attempted control of terrorist activities. *See, e.g., The Role of Cuba in International Terrorism and Subversion, Intelligence Activities of the DGI, Before the Subcomm. on Security and Terrorism of the Senate Comm. on Judiciary*, 97th Cong., 2d Sess. 85 (1982) (statement of Fred C. Ikle, Undersecretary of Defense for Policy). The President has repeatedly demonstrated his concern that terrorism be combated, both ·in his statements at home, and in the declarations that have accompanied his meetings with our allies. *See* 18 *Weekly Compilation of Presidential Documents*, 35, 575, 763, 783, 1352 (1982). It is thus obvious that even with this declaration of nonjusticiability by the court, the work of tracing and assessing responsibility for terrorist acts will continue by those parts of the government which by

---

4. *See, e.g., Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981) ("Matters intimately related to foreign policy are rarely proper subjects for judicial intervention.); *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

tradition and accumulated expertise are far better positioned than the courts to conduct such inquiries.

### D. Cases such as this one are not susceptible to judicial handling.

As noted above in section A, the pragmatic problems associated with proceedings designed to bring terrorists to the bar are numerous and intractable. One other note must be added. Courts have found it extremely difficult to apply the "political exception" doctrine in extradition proceedings when those proceedings have concerned prisoners who are accused of terrorist activities. *See Abu Eain v. Adams*, 529 F.Supp. 685 (N.D.Ill.1980) *and McMullen v. Immigration and Naturalization Service*, 658 F.2d 1312 (9th Cir.1981). This difficulty is so pronounced that one member of the executive branch has testified to Congress that there is simply "no justiciable standard to the political offense," and that when courts have been confronted with such situations, "there has been a tendency for a breakdown in the ability of our courts to process extradition questions," with the result that courts "tend to beg the question ...". *Extradition Reform Act of 1981, Hearings on H.R. 5227 Before Subcomm. on Crime of the House Comm. on the Judiciary*, 97th Cong., 2d Sess. 24–25 (Testimony of Roger Olson, Deputy Asst. Attorney General, Criminal Division, U.S. Dept. of Justice). If courts are vexed by these questions within the limited context of extradition proceedings—an area in which there is considerable judicial experience—it is easy to anticipate the breakdowns that would accompany proceedings under 28 U.S.C. § 1350 if they are allowed to go forward. Sound consideration of the limits of judicial ability demands invocation of the political question doctrine here. This is only common sense and a realistic measure of roles that courts are simply not equipped to play.

### E. The possible consequences of judicial action in this area are injurious to the national interest.

The certain results of judicial recognition of jurisdiction over cases such as this one are embarrassment to the nation, the transformation of trials into forums for the exposition of political propaganda, and debasement of commonly accepted notions of civilized conduct.

We are here confronted with the easiest case and thus the most difficult to resist. It was a similar magnet that drew the Second Circuit into its unfortunate position in *Filartiga*.[5] But not all cases of this type will be so easy. Indeed, most would be far less attractive. The victims of international violence perpetrated by terrorists are spread across the globe. It is not implausible that every alleged victim of violence of the counter-revolutionaries in such places as Nicaraugua and Afghanistan could argue just as compellingly as the plaintiffs here do, that they are entitled to their day in the courts of the United States. The victims of the recent massacres in Lebanon could also mount such claims. Indeed, there is no obvious or subtle limiting principle in sight. Even recognized dissidents who have es-

---

5. I do not doubt for a moment the good intentions behind Judge Kauffman's opinion in *Filartiga*. But the case appears to me to be fundamentally at odds with the reality of the international structure and with the role of United States courts within that structure. The refusal to separate rhetoric from reality is most obvious in the passage which states that "for the purposes of civil liability, the torturer has become—like the pirate and slave trader before him—*hostis humani generis*, an enemy of all mankind." 630 F.2d at 890. This conclusion ignores the crucial distinction that the pirate and slave trader were men without nations, while the torturer (and terrorist) are frequently pawns, and well controlled ones, in international politics. When Judge Kauffman concluded that "[o]ur holding today, giving effect to a jurisdictional provision enacted by our First Congress, is a small but important step in the fulfillment of the ageless dream to free all people from brutal violence," *id.*, he failed to consider the possibility that *ad hoc* intervention by courts into international affairs may very well rebound to the decisive disadvantage of the nation. A plaintiff's individual victory, if it entails embarassing disclosures of this country's approach to the control of the terrorist phenomenon, may in fact be the collective's defeat. The political question doctrine is designed to prevent just this sort of judicial gambling, however apparently noble it may appear at first reading.

caped from the Soviet Union could conceivably bring suit for violations of international law having to do with the conditions of their earlier confinements. Each supposed scenario carries with it an incredibly complex calculus of actors, circumstances, and geopolitical considerations. The courts must steer resolutely away from involvement in this manner of case. It is too glib to assert simply that courts are used to dealing with difficult questions. They are not used to this kind of question.

The more arcane aspects of international law connected to this case are dealt with by my colleagues. Their reviews of the subject are quite exhaustive and their speculations on the riddle of § 1350 are innovative. But it is all quite unnecessary. Especially inappropriate is their apparent reliance for guidance on the distinguished commentators in this field. I agree with the sentiment expressed by Chief Justice Fuller in his dissent to *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), where he wrote that it was "needless to review the speculations and repetitions of writers on international law.... Their lucubrations may be persuasive, but are not authoritative." *Id.* at 720, 20 S.Ct. at 307 (Fuller, J. dissenting). Courts ought not to serve as debating clubs for professors willing to argue over what is or what is not an accepted violation of the law of nations. Yet this appears to be the clear result if we allow plaintiffs the opportunity to proceed under § 1350. Plaintiffs would troop to court marshalling their "experts" behind them. Defendants would quickly organize their own platoons of authorities. The typical judge or jury would be swamped in citations to various distinguished journals of international legal studies, but would be left with little more than a numbing sense of how varied is the world of public international "law".

Judge Edwards writes that "[t]his case deals with an area of law that cries out for clarification by the Supreme Court. We confront at every turn broad and novel questions about the definition and application of the 'law of nations'." Edwards Opinion at 775. I must disagree. When a case presents broad and novel questions of this sort, courts ought not to appeal for guidance to the Supreme Court, but should instead look to Congress and the President. Should these branches of the Government decide that questions of this sort are proper subjects for judicial inquiry, they can then provide the courts with the guidelines by which such inquiries should proceed. We ought not to parlay a two hundred years-old statute into an entree into so sensitive an area of foreign policy. We have no reliable evidence whatsoever as to what purpose this "legal Lohengrin", as Judge Friendly put it, was intended to serve. *ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir.1975). We ought not to cobble together for it a modern mission on the vague idea that international law develops over the years. Law may evolve, but statutes ought not to mutate. To allow § 1350 the opportunity to support future actions of the sort both countenanced in *Filartiga* and put forward here is to judicially will that statute a new life. Every consideration that informs the sound application of the political question doctrine militates against this result. My colleagues concede that the origins and purposes of this statute are obscure, but it is certainly obvious that it was never intended by its drafters to reach this kind of case. Accordingly, I concur in the decision to affirm the dismissal of this case.

